IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| AMERICAN IMAGING SERVICES, INC., | § | |
| | § | |
| Plaintiff, | § | Civil Action No. 3:09-CV-733-M |
| v. | § | |
| | § | JURY TRIAL DEMANDED |
| AUTODESK, INC., | § | |
| | § | |
| Defendant. | § | |
| | § | |

### PLAINTIFF'S PRELIMINARY PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff American Imaging Services, Inc. ("AISI") proposes the following findings of fact and conclusions of law for the issues tried during the bench trial phase of this matter. AISI requests that, to the extent that the Court disagrees with the characterization of a proposed finding as one of fact rather than a conclusion of law, or vice versa, that the Court treat the proposals as though they had been properly characterized. AISI further anticipates supplementing these proposed findings and conclusions after the bench trial concludes.

### FINDINGS OF FACT

#### The Parties

1.      Plaintiff American Imaging Services, Inc. was formed in 1986. AISI is located at 4039 Cobblers Lane, Dallas, TX 75287.

2.      AISI is the owner by assignment of U.S. Patent No. RE40,384 (the Patent-in-Suit or the '384 Patent). AISI is also the owner by assignment of U.S. Patent 5,353,393 (the '393 Patent).

3.      Defendant Autodesk, Inc. was formed in 1982.   Autodesk's headquarters is located at 111 McInnis Parkway, San Rafael, California.

**Procedural History of the Patents**

4.      The '393 Patent issued on October 4, 1994 and claims priority to application No. 07/366,665, filed on June 14, 1989.

5.      On April 24, 1997, AISI filed suit against Intergraph Corporation alleging infringement of the '393 Patent.

6.      On March 17, 1999, the Southern District of Texas found all claims of the '393 Patent invalid.

7.      On June 12, 2000, the Federal Circuit affirmed the Southern District's finding of invalidity of all claims of the '393 Patent except claims 12, 35, 26, and 42.

8.      AISI filed a reissue application, which ultimately issued as the '384 Patent, on January 30, 2004.

9.      The Intergraph case concluded on May 4, 2004.

10.     The '384 Patent issued June 17, 2008 and expired October 4, 2011.

11.     The '384 Patent and the original '393 Patent list Paul Bennett, William Opincar, and Wylie McDonald as named inventors.

12.     AISI filed the present lawsuit against Autodesk on April 22, 2009.

13.     AISI alleges infringement of claims 14, 15, 108, and 114 of the '384 Patent ("Asserted Claims").

14.     The filing of the present lawsuit was the first notice that AISI gave Autodesk of its claim of infringement of the '384 Patent.

15.     During 2010 and 2011, Autodesk requested three times that the United States Patent and Trademark Office reexamine the '384 Patent.  Its first request for reexamination was filed with the United States Patent and Trademark Office on June 29, 2010.  That request was

granted on or about September 15, 2010.   Autodesk filed its second request for reexamination on May 20, 2011.  That request was denied on July 13, 2011.  Autodesk filed its third request for reexamination on November 1, 2011. That request was also denied, after petition by requester, on August 3, 2012.

16.     On July 10, 2012, the United States Patent and Trademark Office issued a Reexamination certificate wherein the Asserted Claims — claims 14, 15, 108, and 114 — were confirmed without modification.

### Development of the Inventions of the '393 Patent and '384 Patent and AISI's Business

17.     In September 1987, AISI's President Mr. William Opincar hired Paul Bennett to implement Mr. Opincar's idea of putting a scanned drawing on a screen in connection with a CAD program.   Mr. Bennett was paid $15,000 in March 1988 after achieving that implementation using AutoCAD prior to that date.  This program became known as LunaLink.

18.     Around March 1988, Mr. Opincar and Mr. Bennett had the idea to add functionality of allowing a user to edit the scanned image to create an edited image using the vector capabilities of CAD systems.  Mr. Bennett worked on programming the code over the next several months, which eventually became the LunaEdit product.

19.     In May 1988, AISI exhibited at the A/E/C trade show.   At the show, AISI demonstrated LunaLink.  At the time of the show, LunaLink was minimally operational but there were several issues with the reliability of its operation.

20.     AISI took orders for LunaLink as well as LunaEdit beginning around May 24, 1988.  The first shipment of LunaLink was June 15, 1988.

21.     Development of LunaEdit was ongoing during the summer and fall of 1988.  The first shipment of LunaEdit was in November 1988.

22.     On August 3, 1989, AISI's President Mr. Opincar sent Walt Spevak of Autodesk a letter and followed up with a demonstration disk of LunaLink and LunaEdit for AutoCAD. The evidence also showed that Mr. Opincar and AISI never received a response to that letter.

23.     In late 1989, AISI's financial struggles culminated in it being unable to pay its employees and allowing them to keep their work computers in lieu of compensation.

24.     AISI became unable to pay its bills as they occurred.  In early 1990, AISI was locked out of its Dallas office as a result of a creditor's lien and the office equipment, including AISI's remaining computers, was sold at auction by the sheriff.

25.     Upon Mr. Opincar's return to AISI's offices after being locked out, he discovered his files in disarray, including trash bags full of documents and materials.  Mr. Opincar preserved those documents and materials, other than some payroll records, which he did not retain.

26.     After the '393 Patent issued, in or around late 1995 to early 1996, AISI engaged Pricewaterhouse as its agent to investigate potentially selling and/or licensing the '393 Patent. As part of this investigation, both Mr. Opincar and people at Pricewaterhouse identified companies that they believed might be interested in the '393 Patent.

27.     In association with this investigation, AISI also obtained both an invalidity opinion of counsel and an infringement opinion.  The infringement opinion focused on four companies, including Intergraph, which AISI sued in 1997, but did not include Autodesk.

28.     AISI informed Autodesk of the '393 Patent and its implications to Autodesk's business at least in October 1996 through its agent Pricewaterhouse.

**Autodesk's Business**

29.    AutoCAD and the represented products are computer-aided design ("CAD") software applications used for drafting and editing engineering drawings.

30.    Autodesk presented evidence showing that it releases a new version of AutoCAD approximately every 1 to 1.5 years.

## Autodesk's Allegations of Inequitable Conduct

*SuperPaint Demonstration and Snider Video Declaration*

31.    Autodesk alleges that Mr. Opincar misleadingly demonstrated the prior art computer software SuperPaint during the prosecution of the '384 Patent. Autodesk relied on the testimony of Mr. William Snider, creator of SuperPaint, to support its allegation. The Court finds that Mr. Snider failed to adequately explain how Mr. Opincar's demonstration was misleading.

32.    Autodesk has also asserted that it was improper for AISI not to submit the video declaration of Mr. Snider from the Intergraph litigation during the '384 Patent prosecution. The Court finds that Mr. Snider's video declaration is not prior art to the '384 Patent, as it was created sometime between 1997 and 2000. Thus, AISI had no duty to disclose the Snider video declaration.

33.    There is insufficient evidence to prove that Mr. Opincar's demonstration was actually misleading. The evidence showed that SuperPaint does not have a vector-based coordinate system, as the Court has construed the term "vector-based" in this case. For instance, Mr. Snider testified that lines in SuperPaint cannot be created by inputting numerical values and can only be drawn by dragging the cursor from one point to another point where the user wants the line to end. Mr. Snider also testified that SuperPaint cannot tell how far apart lines are on the

screen (i.e., that there is no mathematical relationship between images drawn). Mr. Snider further stated that a user of SuperPaint cannot scale a drawing using the system, because SuperPaint does not allow a user to enter a scale reflecting the size of an actual object that the user is trying to capture in the drawing.

34.     The Patent Examiner had the opportunity during the demonstration to ask questions and work with SuperPaint if he had chosen to do so.  The Court finds the testimony of one of AISI's attorneys who was present during the demonstration, Mr. Tompkins, credible as he explained that there was considerable back and forth dialogue between the Examiner and the lawyers during that demonstration.  The Court further credits Mr. Tompkins' testimony that if he felt that something about the demonstration had been misleading then he would have said so at the time.

35.     The Patent Office had multiple sources of information about SuperPaint and would not have been misled by any presentation by Mr. Opincar if that presentation had contained any inaccuracies.   For instance, the evidence showed that Mr. Opincar and his attorneys disclosed manuals from the makers of SuperPaint and other third party related documents describing SuperPaint's functionality to the Patent Office, including the written declaration of Mr. Snider from the Intergraph litigation. There was also evidence in the prosecution history of the '384 Patent that the Examiner reviewed the SuperPaint documents prior to issuing the '384 Patent claims.   The prosecution history also reflected that AISI submitted the summary judgment briefing from the Intergraph case discussing SuperPaint, the district court opinion invalidating all of the original claims in view of SuperPaint, and the Federal Circuit opinion affirming the lower court as to most of the claims.

36. The evidence also showed that Autodesk directly argued the disclosure of the SuperPaint manual as a prior art reference to the Patent Office and argued that the Asserted Claims 14 and 15 should not have been allowed in view of that manual in combination with another reference during the reexamination of the '384 Patent that Autodesk initiated during this case. The evidence showed that the Patent Office reviewed Autodesk's submission and arguments, disagreed with its characterizations and ultimately affirmed Asserted Claims 14 and 15 as patentable over SuperPaint.

37. It is impossible for the Court to conclude that the Patent Office would have found anything different about the disclosure of SuperPaint had it viewed the Snider video declaration or had Mr. Opincar demonstrated SuperPaint differently. Thus, the Court holds that Autodesk did not meet its burden of showing materiality.

38. The Court also finds that there is no evidence of an intent to deceive the Patent Office by anyone participating in the prosecution of the '384 Patent, including Mr. Opincar, Mr. Patti, Mr. Tompkins, or Mr. Storm, related to the SuperPaint demonstration or lack of disclosure of the Snider video declaration. The Court credits Mr. Patti and Mr. Tompkins' testimony that they would not have intentionally misled the Patent Office. The Court also credits Mr. Opincar's testimony that he tried to accurately portray SuperPaint and to demonstrate how he believed it differed from the claimed invention. Even if Mr. Opincar or his lawyers omitted any information about SuperPaint, the Court finds that such an omission would have been inadvertent and not the result of any specific intent to deceive. It is not inequitable conduct to omit telling the patent examiner information that the applicant in good faith believes is not material to patentability."

*Allied Colloids, Inc. v. Am. Cynamid Co.*, 64 F.3d 1570, 1578 (Fed. Cir. 1995) (vacating judgment of unenforceability).

*Declarations Regarding CAD Overlay 2.0*

39.    Autodesk has argued that Rule 131 declarations submitted by the inventors of the '384 Patent in conjunction with the attorney remarks about the content of those declarations was misleading to the Patent Office.   The Court finds that the evidence shows that the Rule 131 declarations are true.   The Court also finds that the remarks submitted with the declarations were inadvertently incorrect and are immaterial in any event to the Patent Office's determination that the declarations were sufficient.

40.    Rule 131 declarations are used during patent prosecution to allow an inventor to show that his invention was conceived of, and thereafter diligently reduced to practice, on a date before the date of a prior art reference.   37 C.F.R. §1.131; *In Re Eickmeyer*, 602 F.2d 974, 978 (C.C.P.A. 1979) ("The purpose of filing a 131 affidavit is to overcome the effective date of a reference cited in support of a rejection.").   The practice is also called "swearing behind" a reference.

41.    The AISI inventors submitted declarations in May 2006 during the prosecution of the '384 Patent explaining that they conceived of the "Invention" prior to August 8, 1988, which is the date of potential prior art CAD Overlay 2.0.   The inventors declared that "[a]fter conception of the Invention, we were diligent in attempting to reduce the Invention to practice." They also declared that "[p]rior to August 8, 1988, AISI began shipping copies of LunaLink, a computer program embodying some of the features of the Invention."   The evidence established that each of these statements is true.   Mr. Opincar credibly testified that his declaration was true.

There was no testimony to support a finding that any part of the declaration of Mr. Bennett was untrue, as Mr. Bennett did not testify on this point.

42.     Mr. Patti also testified that, while he did not recall the declarations or the remarks that he submitted to the Patent Office along with the declarations, if there were any inaccuracies in the summary it was due to an unintentional mistake.   Mr. Patti's remarks stated that the declarations were submitted "to establish that Applicant conceived of and reduced to practice the present invention prior to CAD Overlay's publication date of August 8, 1988."   The evidence showed that there is a question as to whether the invention was reduced to practice prior to August 8, 1988.   Further, the Rule 131 declarations do not state that the invention was reduced to practice prior to August 8, 1988.   Mr. Opincar and Mr. Bennett testified credibly that AISI was actively working on LunaEdit from the summer of 1988 through testing in August and in the Fall of 1988.   This evidence showed that AISI was diligent in attempting to reduce it to practice, as stated in the declarations.   Diligence in reduction to practice is sufficient to pre-date a reference even if the reduction to practice is not complete before the publication date of the prior art. *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1578 (Fed. Cir. 1996).

43.     The Court also finds no intent to deceive by Mr. Patti in submitting remarks that are inconsistent with the Rule 131 declarations submitted contemporaneously.   The Court credits Mr. Patti's testimony that he has never lied to the Patent Office and would not risk his career by intentionally providing misleading information.   The evidence showed that, at worst, Mr. Patti simply made a mistake in his summary of the Rule 131 declarations in his remarks and that he submitted the declarations themselves contemporaneously with his remarks.   A mistake in an attorney argument is not evidence of intent to deceive. *Kingsdown*, 863 F.2d at 876 (holding that

even a finding of gross negligence does not justify an inference of intent to deceive); see also *Eisai Co., Ltd. v. Dr. Reddy's Labs, Ltd.*, 533 F.3d 1353, 1360-61 (Fed. Cir. 2008) (affirming trial court finding of no evidence of intent to deceive based on inventor testimony).

44.     Likewise, because there is no evidence that the declarations were false, the Court finds that there was no intent to deceive the Patent Office by any of the declarants in submitting those declarations.

*Description of CAD Overlay 1.0*

45.     Autodesk argues that AISI's attorney argument about the CAD Overlay 1.0 reference during the '384 Patent prosecution was misleading and that claim 14 of the '384 Patent would not have issued but-for AISI's mischaracterization.  The Court disagrees.

46.     The evidence showed that AISI's attorneys properly characterized the disclosure of CAD Overlay 1.0.  The evidence will also show that AISI's attorneys submitted the documents that they had related to CAD Overlay to the Examiner, and he considered them.  The evidence showed that AISI's attorney argument was based on inferences from the disclosure of the CAD Overlay 2.0 manual.  The Court finds AISI's inferences reasonable, as it is unlikely that CAD Overlay 1.0 had more advance functions that CAD Overlay 2.0.  Thus, if a feature was not present in CAD Overlay 2.0, it was also likely not present in CAD Overlay 1.0.

47.     The evidence also showed that Autodesk submitted a request for reexamination of the '384 Patent during this case,  presenting the CAD Overlay 2.0 manual as a prior art reference and arguing that the Asserted Claims 14, 15, 108, and 114 should not have been allowed in view of that manual in combination with an AutoCAD reference manual.  The Patent Office accepted Autodesk's request for reexamination, found the CAD Overlay 2.0 manual's disclosure to be

cumulative in view of two other references, extensively considered those references and additional references, and Autodesk's arguments about all of them, and affirmed all of the claims as patentable over CAD Overlay and the other references. Thus, all of the evidence will show that the Patent Office has considered CAD Overlay multiple times and has both issued and confirmed the Asserted Claims of the '384 Patent over it.

48.    The Court finds that Autodesk has failed to provide sufficient evidence to show that but-for AISI's characterizations of CAD Overlay 1.0, Claim 14, or any other claim, would not have issued.

49.    The Court also finds no evidence of any intent to deceive by any AISI attorney in arguing the disclosure of CAD Overlay 1.0. *Carbide Blast Joints, Inc. v. Rickert Precision Indus., Inc.*, No. 95-1040, 95-1059, 1995 WL 710871 at *4-5 (Fed. Cir. Dec. 4, 1995) (reversing lower court finding of intent to deceive and noting that at best the evidence indicated simple negligence or erroneous judgment and "the burden is not on the patentee to prove good faith during the prosecution, but on the alleged infringer to prove deceptive intent").

*Disclosure of LunaLink/LunaEdit During '393 Patent Prosecution*

50.    Autodesk asserts that AISI's lack of disclosure of the development and pre-orders of its LunaLink and LunaEdit products during the '393 Patent prosecution was material and that at least claim 26 of the '393 Patent would not have issued had there been a disclosure.

51.    The Court finds that AISI did not have a duty to disclose anything related to LunaLink and LunaEdit during the '393 Patent prosecution, which occurred from 1989 to 1994. The law of disclosure requirements during the time of the prosecution of the original '393 Patent was different than it is now and different than what it was during the time of the prosecution of

the reissue '384 Patent.  A patent applicant has long been required to disclose information known to be "material to patentability" (37 C.F.R. § 1.56), but the meaning of materiality has changed over time, and thus the scope of the disclosure requirement has also changed.

52.    The law regarding disclosure changed significantly with the Supreme Court's *Pfaff* decision, *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55 (1998).  In *Pfaff*, the Supreme Court clarified the standard for determining satisfaction of the on-sale bar of 35 U.S.C. § 102(b), which provided at the time that "[a] person is not entitled to a patent if the invention was ... on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b) (1994).[1]

53.    Pre-*Pfaff*, "[i]n order for a patent to be invalid under [section 102(b)], the claimed invention asserted to have been on sale must [have been] substantially completed with reason to expect it would work for its intended purpose…" *Evans Cooling Sys., Inc. v. Gen. Motors Corp.*, 125 F.3d 1448, 1450 (Fed. Cir. 1997).  Thus, pre-*Pfaff*, a patent applicant offering a product for sale that was not actually completed at the time of the offer could have reasonably believed that it did not need to disclose that offer because there was no complete product.  Many courts had held that an incomplete product offering would not have triggered the 102(b) on-sale bar under the law from 1989-1998.  *See, e.g.*, *Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*, 103 F.3d 1538, 1544-45 (Fed. Cir. 1997). (finding no on-sale bar where offer to sell was for a machine where only a prototype was developed and only sketches for additional parts of the invention

---

[1]  The Supreme Court held that the on-sale bar applies when, more than one year prior to the filing date, (1) the invention was the subject of a commercial offer for sale, and 2) the invention was "ready for patenting."  *Id.* at 67-68.  The "ready for patenting" condition may be satisfied "by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention."  *Id.*

were done); *Seal-Flex, Inc. v. Athletic Track and Court Constr.*, 98 F.3d 1318, (Fed. Cir. 1996) (reversing summary judgment on on-sale bar and collecting cases where courts found that contacts with potential customers before an invention was completed did not start the on-sale bar period).

54.     Mr. Opincar credibly testified that his attorneys had all of the information that he had on the timing of the development of LunaLink and LunaEdit during the prosecution of the '393 Patent.  *Insultherm, Inc. v. Tank Insulation, Int'l, Inc.*, No. 94-1378, 1995 WL 453400, at *2-4 (Fed. Cir. Apr. 25, 1995) (reversing lower court finding of intent to deceive noting that at most the record showed gross negligence by patent attorney where inventor testified that he provided his patent attorney with all prior art and patent attorney testified he did not disclose one piece because he thought it differed from the invention).

55.     Mr. Opincar also testified that the original '393 Patent application was filed on June 14, 1989, because the first time that AISI shipped the LunaLink product was June 15, 1988 and he understood that was the date to be concerned about for an on-sale bar.  *Cf. Sensonics, Inc. v. Aerosonics Corp.*, 81 F.3d 1566, 1570-71 (Fed. Cir. 1996) (affirming finding of no intent to deceive based on testimony of inventor that he did not think his own prior art patent was relevant to his current invention and fact that defendant's counsel also did not initially notice the relevance of prior art).

56.     Mr. Opincar further testified that he relied upon his lawyers during the prosecution of the '384 Patent and the '393 Patent to provide the information to the Patent Office that there was a duty to disclose.  There was no evidence that Mr. Opincar withheld any information from the Patent Office with an intent to deceive.

57.     Even if there was a duty to disclose LunaLink and LunaEdit to the Patent Office during the prosecution of the '393 Patent, there is no evidence of but-for materiality as required by *Therasense*.  Autodesk has presented no credible evidence that any claims of the '393 Patent would not have issued if the Patent Office had information about the preorders and development of LunaLink and LunaEdit.

58.     Autodesk also failed to meet its burden of showing that Mr. Griggs (AISI's attorney during the '393 prosecution) had any intent to deceive the Patent Office in not disclosing the information about LunaLink and LunaEdit.  It is entirely possible that Mr. Griggs' view of the law was that such information did not need to be disclosed.  *Scanner Techs. Corp. v. ICOS Vision Sys. Corp N.V.*, 528 F.3d 1365, 1376 (Fed. Cir. 2008) ("Whenever evidence proffered to show either materiality or intent is susceptible of multiple reasonable inferences, a district court clearly errs in overlooking one inference in favor of another equally reasonable inference.").  An inference of intent to deceive must be the "single most reasonable inference able to be drawn from the evidence." *Larson Mfg.*, 559 F.3d at 1340 (citation omitted).

59.     Mr. Griggs is deceased, and therefore could not testify at trial.  Thus, there is no evidence of his subjective intent regarding to any aspect of the '393 Patent prosecution.  As such, Autodesk did not meet its burden on this element.  *M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co.*, 439 F.3d 1335, 1342-43 (Fed. Cir. 2006) (reversing finding of intent to deceive that essentially amounted to strict liability for nondisclosure noting that a good faith explanation was unavailable because the inventor had died and the lack of a good faith explanation for nondisclosure is not sufficient to constitute clear and convincing evidence of intent).

*Non-disclosure of CAD Overlay 1.0 During the '393 Patent Prosecution*

60.     Autodesk has also argued that AISI's failure to disclose CAD Overlay 1.0 during the '393 Patent prosecution is a basis for inequitable conduct.  However, Autodesk has no expert reports or other testimony regarding whether and how CAD Overlay would have been but-for material in the '393 Patent prosecution.  Under *Therasense*, Autodesk must prove that the '393 Patent claims would not have issued if CAD Overlay 1.0 had been disclosed.  *Therasense*, 649 F.3d at 1291.  With no testimony on this issue, Autodesk did not meet its burden.

61.     Further, Autodesk has attempted to show that Mr. Opincar had the CAD Overlay 1.0 manual during the prosecution of the '393 Patent.  However, the Court finds Mr. Opincar's testimony credible that he did not personally have the manual at any time.  The Court also finds that Mr. Opincar disclosed a memorandum about CAD Overlay 1.0 to his lawyer Mr. Griggs during the '393 Patent prosecution.  Although the fact that a memorandum exists about CAD Overlay 1.0 may suggest that AISI had the manual or some amount of information about the product at least prior to June 1988 (the date of the memo), the memorandum was neither written by nor addressed to Mr. Opincar.  Overall, the evidence shows that Mr. Opincar disclosed what he had about CAD Overlay 1.0 to his lawyers during the '393 Patent prosecution.  Thus, the Court finds that there is no evidence to support a finding of an intent to deceive by Mr. Opincar.

62.     Likewise, there is no evidence of any intent to deceive the Patent Office by Mr. Griggs in not disclosing information about CAD Overlay 1.0.  First, there is no evidence that Mr. Griggs ever had any information that he should have disclosed.  The memorandum that is in evidence is not prior art and would not have to have been disclosed.  Second, there is no evidence that Mr. Griggs intended to deceive anyone.  There is no evidence as to Mr. Griggs' subjective belief about or knowledge of any materiality of CAD Overlay and even if there was,

"[k]nowledge of the reference and knowledge of materiality alone are insufficient after *Therasense* to show an intent to deceive." *1st Media LLC v. Electronic Arts, Inc.*, 694 F.2d 1367, 1375 (Fed. Cir. 2012) (holding that there was no evidence of a deliberate decision by the patentee or his lawyer to withhold a reference and noting that it was clear error for the court to have relied on the lawyer's inability to offer a good faith explanation as a basis to infer a deliberate decision to withhold ).

## CONCLUSIONS OF LAW

### Inequitable Conduct

63.     "To prevail on the defense of inequitable conduct, the accused infringer must prove that the applicant misrepresented or omitted material information with the specific intent to deceive the PTO." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011) (en banc).  Each element of inequitable conduct (materiality and intent to deceive) must be proven by clear and convincing evidence. *Star Scientific Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1365 (Fed. Cir. 2008).

64.     "Intent and materiality are separate requirements."  *Therasense*, 649 F.3d at 1290. A finding of materiality, no matter how material the Court finds the non-disclosed information or misrepresentation to be, is irrelevant to the Court's determination of intent to deceive.  *Id.* ("[A] court must weigh the evidence of intent to deceive independent of its analysis of materiality."); *Star Scientific*, 537 F.3d at 1366 ("[M]ateriality does not presume intent, which is a separate and essential component of inequitable conduct."); *see also Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 552 (Fed. Cir. 1990) (affirming finding of no intent to deceive despite argument that undisclosed information was known to the inventor and was highly material).

65.     The standard to establish materiality in the context of inequitable conduct is "but-for" materiality. *Therasense*, 649 F.3d at 1291.  "But-for" materiality means that Autodesk must prove by a preponderance of evidence that the Patent Office would not have allowed a claim if it had been aware of the withheld reference. *Id.*  Alternately, if Autodesk proves "affirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit," that misconduct is material. *Id.*  at 1292.

66.     "Intent to deceive cannot be inferred solely from the fact that information was not disclosed; there must be a factual basis for a finding of deceptive intent." *Hebert v. Lisle*, 99 F.3d 1109, 1116 (Fed. Cir. 1996) (reversing judgment of unenforceability finding no evidence of materiality or intent to deceive).  "A district court should not use a "sliding scale," where a weak showing of intent may be found sufficient based on a strong showing of materiality, and vice versa." *Therasense*, 649 F.3d at 1290.  "Proving that the applicant knew of a reference, should have known of its materiality, and decided not to submit it to the PTO does not prove specific intent to deceive. *Id*. citing *Star Scientific,* 537 F.3d at 1366 ("the fact that information later found material was not disclosed cannot, by itself, satisfy the deceptive intent element of inequitable conduct").

67.     The law has long been clear that mistake, negligence, or even gross negligence do not support an inference of intent to deceive. *Kingsdown Med. Consultants, Ltd. v. Hollister Inc*., 863 F.2d 867, 876 (Fed. Cir. 1988) (en banc).  In *Kingsdown*, the Federal Circuit clarified that the intent element of inequitable conduct cannot be satisfied by conduct amounting to gross negligence:

> We adopt the view that a finding that particular conduct amounts to "gross negligence" does not of itself justify an inference of intent to deceive; the

involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive.

68.     Intent to deceive "is a subjective inquiry into whether the inventor knew the information was material and chose not to disclose it." *Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1226-27 (Fed. Cir. 2006) (affirming finding of no intent to deceive where trial court relied on testimony that inventor did not believe prior inventions were material because the prior inventions were very different configurations from his invention, even though the Federal Circuit also found the inventor was incorrect in his belief about materiality); *see also Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1332 (Fed. Cir. 2009) (affirming finding of no intent to deceive based on inventor testimony that regardless of whether a statement he made to the PTO was actually false, he believed it was true when he made it); *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1365-66 (Fed. Cir. 2008) (affirming finding of no intent to deceive where prosecuting attorney did not believe the undisclosed information was material and plaintiffs relied on him).    There is no objective component to this inquiry; this is not a "reasonable person" standard. *Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 939 (Fed. Cir. 1990) (observing that the factual determination of intent to deceive is subjective in nature, reversing the district court holding of inequitable conduct, and finding no intent to deceive even if inventor's statement to the PTO was in error or negligent).

69.     Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence.  *Therasense*, 649 F.3d at 1290.  If intent to deceive is to be inferred from any evidence, including circumstantial evidence, that evidence must still be clear and convincing. *Star Scientific*, 537 F.3d at 1366. An inference of intent to deceive must be

the "single most reasonable inference able to be drawn from the evidence." *Larson Mfg. Co. v. Aluminart Prods. Ltd*., 559 F.3d 1317, 1326 (Fed. Cir. 2009).   "[W]hen there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found." *Therasense*, 649 F.3d at 1290-1291.  A patentee need not offer any good faith explanation for its actions unless the accused infringer first proves a threshold level of intent to deceive by clear and convincing evidence. *Star*, 537 F.3d at 1368.

70.     The Court finds that Autodesk failed to prove that anyone associated with AISI committed inequitable conduct.   The Court has addressed each of Autodesk's allegations of inequitable conduct in turn above and found the Autodesk had failed to prove either materiality or intent to deceive or both.

71.     Even if the Court had found both materiality and intent to deceive on any of Autodesk's inequitable conduct allegations, a finding of inequitable conduct is still not automatic.   The Court must balance the substantive evidence underlying those factors and all equities to determine whether the '384 Patent should be rendered unenforceable. *Star Scientific*, 537 F.3d at 1367.   The Court weighs the substance of all of the underlying facts found, including the level of materiality of the actions found material, the level of intent found, and other equitable considerations, to determine whether it is fair to punish Plaintiff with the ultimate penalty of unenforceability. *Id.*   The equities in this case weigh heavily against unenforceability.

72.     With respect to any Autodesk theory on inequitable conduct of the original '393 Patent, it would be unfair to hold the '384 Patent unenforceable based on any of that conduct. Each of the references that Autodesk points to as undisclosed and material to the '393 Patent (LunaLink, LunaEdit, and CAD Overlay) were disclosed during the prosecution of the '384

Patent.  Thus, the Patent Office has already found that the '384 Patent claims are patentable even after considering those references.  AISI is not trying to enforce the '393 Patent and any errors in its prosecution (which AISI denies) have been corrected during the prosecution of the patent that it is trying to enforce — the '384 Patent.  There is no justification for punishing AISI for acts related to the original patent that have been ameliorated.

73.     It would also be inequitable to hold the '384 Patent unenforceable based on activities during its prosecution.  Autodesk does not assert that there was any prior art that AISI failed to disclose or intentionally withheld from the Patent Office.  Autodesk's accusations center instead around the way in which AISI characterized certain references.  The Patent Office had every opportunity, and indeed had the obligation to, examine the references actually provided and determine whether it agreed or disagreed with AISI's argument and description.  The evidence shows that the Patent Office performed its duties during the reissue prosecution and again during the reexamination initiated by Autodesk during this case.  Autodesk clearly disagrees with the Patent Office's ultimate determination that it agreed with AISI's view and issued the claims of the '384 Patent over the prior art.  However, if the Patent Office failed in its evaluation in any way, it is not because AISI held information back from it or acted in bad faith.  *Rentrop v. Spectranetics Corp.*, 550 F.3d 1112, 1120 (Fed. Cir. 2008) (affirming district court refusal to find patent unenforceable noting that low materiality and weak intent did not warrant unenforceability).  As such, the '384 Patent should be enforced.

### **Spoliation**

74.     "Spoliation is the 'destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'"  *Ashton v. Knight Trans., Inc.*, 772 F. Supp. 2d 772, 799-800 (N.D. Tex. 2011).  "Destroying or

altering evidence, however, does not necessarily mean that the party has engaged in sanction-worthy spoliation. Instead, the Court must first find the existence of a duty to preserve the information, a culpable breach of that duty, and resulting prejudice to the innocent party." *Id*.

75.     "A duty to preserve the evidence arises 'only when a party knows or reasonably should know that there is a substantial chance that a claim will be filed and that the evidence in its possession or control will be potentially relevant to that claim.'"   *In Re Enron Corp. Securities, Derivative, & ERISA Litigation*, 762 F. Supp. 2d 942, 964 (S.D. Tex. 2010).   If the Court determines that a duty was owed and that it was breached, it must then ask whether the opposing side's ability to present its case was prejudiced by the spoliation. *Id*. at 965.

76.     There is no spoliation if the opposer can prove its case with existing evidence. *Cf. Consol. Aluminum Corp. v. Alcoa, Inc*., 244 F.R.D. 335 (M.D. La 2006) (finding no prejudice because "a court cannot infer that destroyed documents would contradict the destroying party's theory of the case" "based simply on the time frame and individuals involved" particularly when "an overwhelming amount of documentary evidence" had already been produced).

77.     "The Fifth Circuit permits an adverse inference against the destroyer of evidence only upon a showing of 'bad faith' or 'bad conduct.'" *Condrey v. SunTrust Bank of Ga*., 431 F.3d 191, 203 (5th Cir. 2005).   "Mere negligence is not enough, for it does not sustain an inference of consciousness of a weak case." *Vick v. Tex. Employment Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975) ("The adverse inference to be drawn from destruction of records is predicated on bad conduct of the defendant. Moreover, the circumstances of the act must manifest bad faith.") (internal citation omitted).

78.     The sanction imposed against a party for an alleged abusive litigation tactic must be "the least severe sanction adequate to achieve the purpose of the rule under which it was imposed." *Chambers v. NASCO, Inc*., 501 U.S. 32, 44 (1991).

79.     Autodesk argues that AISI spoliated certain documents.

80.     Autodesk has not met its burden of proving that AISI destroyed any documents relevant to this lawsuit at any time.  The Court finds that AISI did not violate any duty that it had at any time to preserve documents relevant to a patent infringement claim.  The Court finds it unnecessary to determine whether AISI's duty to preserve arose in June 1989 when it filed its patent application, in October 1994 when the '393 Patent issued, or at a time thereafter.  Even if AISI's duty to preserve arose in June 1989, there is no evidence that the duty was violated in bad faith any time after that date.

81.     Mr. Opincar testified, supported by contemporaneous photographs, that the computers used at AISI that were still present by late 1989 were seized by the sheriff in early 1990 due to a creditor's lien and were ultimately sold at auction.  To the extent that any source code, technical documents, or other relevant information had been retained as of early 1990 on those computers, the evidence showed that its destruction was not due to any action by Mr. Opincar or anyone else associated with AISI.

82.     Mr. Opincar's testimony that he did not destroy any documents related to the LunaLink and LunaEdit products and their development or any other technical documents since 1990 was credible and supported by the volume of documents presented as evidence in this case that date back to 1989 and through the mid 1990's.

83.     Autodesk has not shown any prejudice to its case by the absence of the payroll and accounting type of documents that Mr. Opincar testified were the only documents that he has destroyed since 1990.

84.     The evidence further showed that although some AISI employees like Paul Bennett were allowed to keep their work computers in lieu of receiving salaries as the company wound down, any failure to retain documents from those computers was not the product of bad faith intent to destroy relevant evidence. *King v. Illinois Cent. R.R.*, 337 F.3d 550, 556 (5th Cir. 2003) (affirming finding of no spoliation where evidence had been presented showing that documents and things were destroyed "for innocuous reasons"); *Dawson v. Autozone Texas, L.P.*, No. 3:09-CV-2144-L, 2011 WL 1641517, at *4-5 (N.D. Tex. Apr. 29, 2011) (finding no spoliation and noting that conclusory allegations that documents were destroyed or that a party otherwise acted in bad faith were not sufficient).

85.     Even if Autodesk had shown that AISI destroyed documents in bad faith, Autodesk did not prove that its case was prejudiced by the absence of any particular document. Generalized allegations of prejudice are insufficient to support a finding of prejudice.   that Document. "Courts have held that speculative or generalized assertions that the missing evidence would have been favorable to the party seeking sanctions are insufficient." *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 616 (S.D. Tex. 2010) (refusing to strike pleadings or enter a default where there was extensive evidence that the adverse party could present, such that any prejudice was not irreparable).

86. Autodesk failed to identify a single allegedly spoliated document for which it could explain any relevance to the issues currently before the Court. For all of the reasons above, Autodesk's spoliation defense is rejected.

**Laches**

87. Laches is an equitable defense in which the defendant must prove two elements: (1) "the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant, and (2) the delay operated to the prejudice or injury of the defendant." *Aukerman v. Chaides*, 960 F.2d 1020, 1032 (Fed. Cir. 1992) (en banc).

88. While a delay of at least six years in filing a lawsuit creates a presumption of laches, that presumption can be rebutted. *Aukerman,* 960 F.2d at 1035, 1038. "By raising a genuine issue respecting either factual element of a laches defense, the presumption of laches is overcome." *Id.* at 1038. Even if the evidence presented is ultimately rejected as not persuasive, its existence is enough to eliminate the presumption. *Id.* Regardless of whether the presumption is overcome, the burden is on the defendant to prove a laches defense. *Id.* at 1039.

89. Even if the presumption of laches applies, a plaintiff can eliminate the presumption by showing that the delay was reasonable and/or excusable. "A court must also consider and weigh any justification offered by the plaintiff for its delay." *Aukerman*, 960 F.2d at 1033. The list of justifications that courts have recognized is extensive, flexible, and includes the existence of "other litigation." *Id.*; *see also Collins Licensing L.P. v. American Tel. & Tel. Co.*, No-90-CA-201, 1992 U.S. Dist. LEXIS 4648, at *2 (W.D. Tex. Mar. 23, 1992) (explaining reissue and reexamination proceedings should be treated similarly to infringement litigation for

purposes of laches and thus a reissue proceeding constitutes "other litigation" sufficient to toll the laches clock).

90.    Moreover, "[e]ven if the elements of laches are established, however, a court need not bar a plaintiff's suit. The application of the laches defense is discretionary, and as an equitable matter, the district court is to look to all the facts and circumstances of the case and weigh the equities of the parties." *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 773 (Fed. Cir. 1995) (finding no laches).  "Laches is not established by undue delay and prejudice. Those factors merely lay the foundation for the trial court's exercise of discretion. Where there is evidence of other factors which would make it inequitable to recognize the defense despite undue delay and prejudice, the defense may be denied." *Aukerman*, 960 F.2d at 1036.

91.    The typical remedy for a finding of laches is limited to the preclusion of recovery of pre-suit damages.  "[A]s a matter of policy, [] laches bars relief on a patentee's claim only with respect to damages accrued "prior to suit." *Id.* at 1041.

92.    Autodesk has argued that the laches period in this case should begin in October 1994 when the original '393 Patent issued.  The Court rejects that argument.

93.    The delay period for filing a lawsuit against the defendant is measured based on when the plaintiff knew or reasonably should have known of its claim.  Thus, the delay period can begin no earlier than when a claim against the defendant arises.  The cause of action of patent infringement is claim specific; one can only infringe a patent by infringing a specific claim or claims of a patent, rather than the patent in general.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) ("It is a 'bedrock principle' of patent law that 'the claims

of a patent define the invention to which the patentee is entitled the right to exclude.'") (internal

citation omitted); 35 U.S.C. § 271 (stating the cause of action for patent infringement as

"whoever without authority…sells any patented invention…infringes the patent"). Thus, in a

patent case, the laches period cannot begin "prior to the issuance of the patent." *Aukerman*, 960

F.2d at 1032.

94.     Prior to a patent issuing, there is no claim for patent infringement. *See State

Contr. & Eng'g Corp. v. Condotte Am., Inc.*, 346 F.3d 1057, 1065-66 (Fed. Cir. 2003) (holding

the earliest date an infringement suit may be brought to be the patent's issuance date). There is

no distinction between an original patent and a reissued patent in this respect. There is no claim

for infringement of a reissue patent application, just as there is no claim for infringement of a

patent application. *See Antonious v. Wilson Sporting Goods Co.*, No. 89 C 6675, 1990 WL

186582, at *5 (N.D. Ill. Nov. 13, 1990) ("When a reissue patent is allegedly infringed, as in this

case, the six-year period does not begin running until the date the reissue patent is issued.")

(internal citation omitted); *Giese v. Pierce Chem. Co.*, 29 F. Supp. 2d 33, 39 (D. Mass. 1998)

(holding that the period of laches with respect to a reissued patent does not begin to run until the

patent emerges from reissue proceedings); *Teradyne Inc. v. Hewlett-Packard Co.*, No. C-91-

0344-MHP, 1994 WL 327213, at *8 (N.D. Cal. June 24, 1994) (finding that laches delay period

could not begin until date of reissue for claims that were not identical to claims that existed in the

original patent).

95.     The instant case involves claims of patent infringement of the '384 Patent, not the

'393 Patent. It is undisputed that the '384 Patent issued in June 2008 and that AISI filed this

lawsuit in April 2009. Because this case was filed about ten months after the '384 Patent issued,

---

the Court finds that the presumption of laches does not apply.  Because a rebuttable presumption of laches does not arise until there is a delay of at least six years, Autodesk must have proven that this ten month delay was both unreasonable and inexcusable and that it was prejudiced or injured by the delay in order to prevail on this defense.  Autodesk has not proven any inexcusable delay in the ten month period between the issuance of the '384 Patent and the filing of this lawsuit and has also not proven any prejudice to its defense by any delay.

96.     Autodesk has argued that the period from which laches should be determined is the issue date of the '393 Patent.  Although the Court disagrees with that conclusion, the Court finds no laches even if that period was considered.

97.     In March 1999, all of the original claims in the '393 Patent were held invalid by the Southern District of Texas on summary judgment.  That decision was affirmed with respect to all but four claims by the Federal Circuit in June 2000.  None of the four claims held valid (former Claims 12, 35, 36, and 42) are the original claims for any of the Asserted Claims here (Claims 14, 15, 108 and 114).  Until the reissue issued in June 2008, there were no valid claims that AISI could have asserted against Autodesk or anyone else.  As the Federal Circuit observed, "[w]ithout a valid and enforceable patent, [the patentee] could not reasonably be held to an obligation to sue in order to avoid a laches holding."  *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 878 (Fed. Cir. 1991) (finding period that the patent was in reissue to be excused); see also *Hemstreet v. Computer Entry Sys. Corp.*, 972 F.2d 1290, 1293 (Fed. Cir. 1992) (noting that a delay based in part on not having a valid patent to enforce was reasonable and excusable).

98.     The evidence showed that AISI knew about a possible claim of infringement of the original '393 Patent by Autodesk at least by April 1996.  During that period, the original claims of the '393 Patent related to the current Asserted Claims (14 and 15) were only valid for the period of April 1, 1996 to March 17, 1999—a period of less than 3 years.  That period combined with the ten month delay after the Asserted Claims were issued in the reissue '384 Patent before this lawsuit was filed totals less than 6 years such that the rebuttable presumption of laches would not apply.

99.     Moreover, the evidence has shown that any delay by AISI in filing suit against Autodesk on the original '393 Patent was reasonable and excusable, because all of the relevant claims of the '393 Patent had been invalidated and it did not have any applicable live claims until the June 2008 reissue.  *TGIP, Inc. v. AT&T Corp.*, 527 F. Supp. 2d 561, 583 (E.D. Tex. 2007) (finding patent reexamination a sufficient explanation for a five year delay in filing).

100.     Further, the evidence showed that AISI was engaged in other patent infringement litigation against Intergraph for the period of April 24, 1997 to May 4, 2004.  Engaging in other litigation is a legitimate excuse for delay in filing against a potential infringer.  *Vaupel*, 944 F.2d at 877.

101.     Autodesk also failed to prove that it was prejudiced by the alleged delay in AISI not filing a lawsuit against it in 1996 or 1997.  Autodesk argued that it was prejudiced because it can no longer obtain various documents that could potentially be relevant evidence.

102.     However, the evidence showed that AISI notified Autodesk of the '393 Patent and AISI's belief that the patent was relevant to Autodesk's business at least as early as October

1996 through its agent Pricewaterhouse. Thus, Autodesk had the opportunity to preserve any evidence from that time forward.

103. Further, the application to which the original '393 Patent dates back was filed June 14, 1989. The '393 Patent did not issue until October 4, 1994. The evidence showed that AISI ceased day-to-day operations during 1990. The evidence also showed that during early 1990, AISI was locked out of its offices and its computer equipment, including all information on that equipment, was sold at auction without its consent. AISI's President Bill Opincar credibly testified that he did not destroy any documents or throw anything away related to LunaLink, LunaEdit or CAD Overlay after he retrieved the paper files and other materials that remained after he regained access to AISI offices in 1990. Thus, the evidence showed that the documents available in this case, including AISI marketing materials, source code, specifications, and documents AISI had related to CAD products or design, have been maintained since well prior to the '393 Patent ever issued in 1994. While Autodesk may have been prejudiced because it cannot track down old documents, that prejudice is not the result of any delay in bringing this suit. Autodesk would have received the same documents from AISI in 1996-97 that it received since this lawsuit began in 2009.

104. Further, the evidence also showed that the documents obtained by AISI during the Intergraph litigation and documents produced by AISI during the Intergraph litigation were given to its counsel in this lawsuit and produced to Autodesk. Considering the sheer volume of documents and testimony that has been preserved, including the 1998 depositions of the named inventors, the Court finds it unlikely there is any evidence that Autodesk could have collected that would not be duplicative or cumulative of evidence to which it had access in this case. Even

accepting that the laches period for this case began during the life of the original '393 Patent, Autodesk has not proven evidentiary prejudice caused by any delay in AISI's filing of this lawsuit.

105.    For all of the reasons above, the Court finds that Autodesk has failed to prove its laches defense as a matter of law.[2]

**Equitable Intervening Rights**

106.    Autodesk has also argued that it is entitled to the defense of equitable intervening rights under 35 U.S.C. § 252 such that the '384 Patent should not be enforced against it.

107.    The doctrine of equitable intervening rights is rooted in 35 U.S.C. § 252 and generally provides that when certain conditions are met, a court in equity may find that a reissued patent may not affect the right of an entity to perform activities that were not previously infringing but that become infringing due to the issuance of a reissued patent as long as substantial preparation for such activities began prior to the reissue. *Marine Polymer Techs., Inc. v. HemCon, Inc.*, 672 F.3d 1350, 1361-62 (Fed. Cir. 2012); *Seattle Box Co., v. Indus. Crating & Packing, Inc.*, 756 F.2d 1574, 1579 (Fed. Cir. 1985).

108.    Autodesk's claim of equitable intervening rights is based on the second sentence of 35 U.S.C. § 252, which provides that: (emphasis added)

---

[2] The Court notes that even had Autodesk proven laches, the Court would not hold the '384 Patent unenforceable. Granting Autodesk's request that the '384 Patent be held unenforceable would be an extreme and atypical sanction. Laches has long been found to preclude recovery of past damages but not future damages. *See, e.g., Menendez v. Holt*, 128 U.S. 514, 524-25 (1888) ("Delay in bringing suit there was, and such delay as to preclude recovery of damages for prior infringement; but there was neither conduct nor negligence which could be held to destroy the right to prevention of further injury in most patent cases.") The Federal Circuit follows the same principle in patent cases: "as a matter of policy, [] laches bars relief on a patentee's claim only with respect to damages accrued prior to suit." *Aukerman*, 960 F.2d at 1041; see also *Studiengesellschaft Kohle MbH v. Eastman Kodak Co.*, 616 F.2d 1315, 1325 (5th Cir. 1980) ("The effect of laches is merely to withhold damages for infringement which occurred prior to the filing of the suit.").

The court before which such matter is in question may provide for the continued manufacture, use, offer for sale, or sale of the thing made, purchased, offered for sale, used, or imported as specified, or for the manufacture, use, offer for sale, or sale in the United States of which substantial preparation was made before the grant of the reissue, and the court may also provide for the continued practice of any process patented by the reissue that is practiced, or for the practice of which substantial preparation was made, before the grant of the reissue, **to the extent and under such terms as the court deems equitable** for the protection of investments made or business commenced before the grant of the reissue.

109.     In considering whether to grant this equitable remedy, courts consider several factors including whether (1) "substantial preparation" was made by the infringer before the reissue patent issued; (2) the infringer continued manufacturing the accused product before the reissue on advice of its patent counsel; (3) there were existing orders or contracts; (4) non-infringing goods cannot be manufactured from the inventory used to manufacture the infringing product and the cost of conversion; (5) there is a long period of sales and operations before the patent reissued from which no damages can be assessed; and (6) the infringer has not made profits sufficient to recoup its investment.  *See, e.g.*, *Henrob Ltd. v. Systemtechnick GMBH & Co.*, No. 05-CV-73214-DT, 2009 WL 3188572, at *16 (E.D. Mich. Sept. 29, 2009) (denying motion for equitable intervening rights); *Visto Corp. v. Sproqit Techs., Inc.*, 413 F. Supp. 2d 1073, 1090-91 (N.D. Cal. 2006) (denying motion for equitable intervening rights).  "Issues of fact underlying the equitable intervening rights are matters for court, not jury, disposition." *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 563 F.3d 1358, 1373 (Fed. Cir. 2009).

110.     "Generally, the goal of the court is to fashion a remedy that would allow the infringing party to recoup its investment. Only in extraordinary circumstances will a court allow a party with intervening rights to continue to manufacture and sell the infringing product for the duration of the patent. 'This would effectively extinguish the patentee's rights under the guise of

protecting the investment of an infringer.'" *Thayer v. Nydigger*, No. 95-2004-AS, 1999 WL 372552, at *12-13 (D. Or. Apr. 15, 1999) (denying equitable intervening rights where there was no evidence of the extent of investment and lack of recoupment) (internal citation omitted).

111.   The Court finds that Autodesk has not proven that it is entitled to a defense of equitable intervening rights.  Autodesk has not provided sufficient evidence on any factor that the Court would consider in applying such a defense.  The Court finds insufficient evidence to support Autodesk's defense of equitable intervening rights as a matter of law.

**Unclean Hands**

112.   The doctrine of unclean hands is rooted in the principle that "he who comes into equity must come with clean hands."  *Precision Instr. Mfg. Co. v. Auto. Maintenance Mach. Co.*, 324 U.S. 806, 814-15 (1945).   Equity demands that a plaintiff "shall have acted fairly and without deceit as to the controversy at issue."  *Id.*   "The maxim of unclean hands is not applied where plaintiff's misconduct is not directly related to the merits of the controversy between the parties, but only where the wrongful acts 'in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication.'"  *Mitchell Bros. Film Group v. Cinema Adult Theater*, 604 F.2d 852, 863 (5th Cir. 1979).

113.   Autodesk argues that AISI's claims should be barred because AISI developed its commercial products LunaLink and LunaEdit during 1987-1989 without a developer license from Autodesk.  The Court finds that the evidence does not support Autodesk's claim.  Even if the evidence supported such a claim, the Court finds it inequitable to apply this doctrine to render AISI's claims barred or the '384 Patent unenforceable.

114.    The Court finds that Autodesk has not proven that AISI did not have a developer license in the late 1980's.

115.    Mr. Opincar credibly testified, supported by a contemporaneous letter to Walt Spevak of Autodesk dated August 3, 1989, that he had informed Autodesk of LunaLink and LunaEdit and was never told that he had improperly used AutoCAD in developing those products.

116.    At best, the Court finds that Autodesk's claim is one of breach of contract for events occurring more than 20 years and about which there is evidence that Autodesk knew at that time.  Autodesk's attempt to revive a dead claim for breach of contract that it has known about even prior to the issuance of the '393 Patent by characterizing it as an equitable defense is rejected.

117.    Moreover, Autodesk's defense falls short because, even if true, AISI's failure to pay a developer fee more than 20 years ago for products last sold in 1990 "is not directly related to the merits of the controversy between the parties."  *Mitchell Bros. Film Group*, 604 F.2d at 863.  The evidence showed that AISI's LunaLink and LunaEdit products never competed with any Autodesk product.   Further, AISI is not asserting that its products are commercial embodiments of any claim of the '384 Patent in order to obtain lost profits damages from Autodesk or in any other way that would impact Autodesk if Autodesk is found liable for infringement.   AISI's use of AutoCAD to develop its products decades ago — whether authorized or not — is irrelevant to its claim that Autodesk infringes the Asserted Claims of the '384 Patent.

118.    Finally, unclean hands is an equitable doctrine that, in the patent context, has historically dealt with cases of egregious misconduct, such as perjury and the manufacture of false evidence.   *Therasense v. Becton, Dickinson, & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011) (en banc).   The act of AISI's product development that Autodesk uses to support this defense does not rise to the level of the type of egregious conduct for which sanctions of unenforceability should be imposed.

Dated:   April 16, 2013                              Respectfully submitted,

                                                     /s/ Paul V. Storm
                                                     Paul V. Storm
                                                       State Bar No. 19325350
                                                       pvstorm@gardere.com
                                                     Sarah M. Paxson
                                                       State Bar No. 24032826
                                                       spaxson@gardere.com
                                                     GARDERE WYNNE SEWELL LLP
                                                     1601 Elm Street, Suite 3000
                                                     Dallas, TX  75201
                                                     214.999.3000
                                                     214.347.4667 (fax)

                                                     Jonathan T. Suder
                                                       State Bar No. 19463350
                                                     Todd I. Blumenfeld
                                                       State Bar No. 24067518
                                                     FRIEDMAN, SUDER & COOKE
                                                     604 East 4th Street, Suite 200
                                                     Fort Worth, TX 76102
                                                     817.334.0400
                                                     817.334.0401 (fax)
                                                     jts@fsclaw.com
                                                     blumenfeld@fsclaw.com


                              **ATTORNEYS FOR PLAINTIFF**


                              **CERTIFICATE OF SERVICE**

        I hereby certify that on the 16th day of April, 2013, I electronically filed the

foregoing document using CM/ECF, which served a copy on counsel of record.


                                                     /s/ Paul V. Storm