**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |
|---|---|
| AMERICAN IMAGING SERVICES, INC., <br><br> Plaintiff, <br><br> v. <br><br> AUTODESK, INC., <br><br> Defendant; <br> ——————————— <br> AUTODESK, INC., <br><br> Counterplaintiff, <br><br> v. <br><br> AMERICAN IMAGING SERVICES, INC., <br><br> Counterdefendant. | Civil Action No. 3:09-CV-733-M |

**AUTODESK, INC.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW FOR FIRST PHASE BENCH TRIAL ON LACHES AND SPOLIATION,
EQUITABLE INTERVENING RIGHTS, AND INEQUITABLE CONDUCT**

Pursuant to the Court's direction at the April 5, 2013 hearing, Defendant-Counterplaintiff Autodesk, Inc. hereby submits its proposed findings of fact and conclusions of law with respect to its counterclaims and affirmative defenses that U.S. Patent RE40,384 ("'384 reissued patent") is unenforceable due to laches and spoliation, equitable intervening rights, inequitable conduct, and unclean hands.[1]  Autodesk plans to submit trial briefs on these claims and defenses following the conclusion of the first phase bench trial and expects  to supplement its proposed findings and conclusions of law based on the evidence presented during the remainder of the bench trial on these issues.

## I.  The '384 Reissued Patent Is Unenforceable Due to Laches and Spoliation

### A.  AISI Knew or Should Have Known of Its Alleged Claim of Patent Infringement by No Later Than 1997

#### 1.  Proposed Findings of Fact

FF1.  American Imaging Services, Inc. ("AISI") was formed in 1986 to provide document scanning and conversion services and ceased conducting regular business operations in January of 1990.  *See* Trial Tr. 35:18-22, 36:4-5, Apr. 9, 2013; Stipulated Fact No. 1, ECF No. 237.

FF2.  AISI has not made or sold any products since 1990.  *See* Stipulated Fact No. 13, ECF No. 237.

FF3.  William Opincar has been AISI's only employee since 1990.

FF4.  Both AISI and Sunwest Trading Group have one employee, William Opincar, and both corporate entities are located at Mr. Opincar's residence.  *See* Trial Tr. 35:3-4, 35:10-11, Apr. 9, 2013.

---

[1]  Contrary to AISI's contention, Autodesk has not consented to waive its right to a jury trial on the issue of AISI's unauthorized use of AutoCAD to develop and commercialize its Luna add-on products without a license, *see* ECF No. 106, and Autodesk therefore expressly reserves its right to present that issue to the jury to the extent it impacts AISI's claim for damages.  Autodesk's equitable defense of unclean hands for purposes of the first phase bench trial is predicated on AISI's conduct that also gives rise to its claims of inequitable conduct and spoliation, as well as AISI's unauthorized use of AutoCAD without a license.

FF5.     Neither AISI nor Sunwest Trading Group makes or sells any software, and the only revenues of AISI are derived from its Sunwest Trading Group division, which sells machine tools.  *See* Trial Tr. 35:5-6, 35:8-9, 35:15-17, Apr. 9, 2013.

FF6.     Image Systems Technology, the company that originally created CAD Overlay, was acquired by Softdesk in 1994.  *See* Trial Tr. 38:20-39:1, Apr. 10, 2013.

FF7.     Mr. Opincar knew that Softdesk acquired Image Systems Technology in 1994.  *See* Trial Tr. 10:11-19, Apr. 10, 2013; Trial Ex. 163.

FF8.     Mr. Opincar knew that Autodesk acquired Softdesk around 1996. *See* Trial Tr. 8:8-15, Apr. 10, 2013.

FF9.     CAD Overlay was rebranded as AutoCAD Raster Design after Autodesk acquired Softdesk.  *See* Trial Tr. 38:13-19, Apr. 10, 2013.

FF10.     U.S. Patent No. 5,353,393 ("original '393 patent") issued October 4, 1994 and claims priority to Application No. 07/366,665, filed June 14, 1989, which was abandoned.  *See* Stipulated Fact No. 3, ECF No. 237.

FF11.     AISI has no other patents other than the original '393 patent which reissued on June 17, 2008 as the '384 reissued patent.

FF12.     In 1996, AISI engaged PriceWaterhouse to try to sell or license its only patent.  *See* Trial Tr. 81:20-23, 82:13-15, Apr. 9, 2013.

FF13.     Mr. Opincar knew about Autodesk years before AISI engaged PriceWaterhouse because AISI had been using AutoCAD since at least 1987 to develop LunaLink and LunaEdit (also referred to as AutoCADLink and AutoCAD Edit) as add-on products.  *See* Trial Tr. 88:6-8, 94:3-5, 51:7-8, Apr. 9, 2013.

FF14.     On May 1, 1996, while Mr. Opincar was the only employee of AISI, he wrote a letter to PriceWaterhouse, stating that "Our knowledge of the CAD marketplace indicates that most of the major suppliers are using this technology.  This

appears to be an important aspect to their products, providing significant contribution to each company's revenue." *See* Trial Tr. 97:24-98:12, Apr. 9, 2013; Trial Ex. 157.

FF15. In a letter to Chris Watson of PriceWaterhouse dated July 22, 1996, Mr. Opincar stated that although Softdesk, the maker of CAD Overlay, "seems to be an ideal purchase candidate, there is a possibility they could protest the patent." *See* Trial Tr. 9:1-10, Apr. 10, 2013; Trial Ex. 163.

FF16. Although Mr. Opincar also refers to Intergraph Corporation in his July 22, 1996 letter to Price Waterhouse, he does not indicate any belief that Intergraph could protest his patent. *See* Trial Tr. 12:22-13:7, Apr. 10, 2013; Trial Ex. 163.

FF17. As of August 28, 1996, AISI and PriceWaterhouse had identified Autodesk among "Identified Users of the Technology" of AISI. *See* Trial Tr. 91:2-14, Apr. 9, 2013; Trial Ex. 159.

FF18. Of the twenty-eight companies listed as "Identified Users of the Technology" on Exhibit 578, a document sent from Chris Watson of PriceWaterhouse to Mr. Opincar on October 18, 1996, only two companies were identified by PriceWaterhouse and the rest were identified by Mr. Opincar. *See* Trial. Tr. 6:4-23, Apr. 10, 2013; Trial Ex. 489.

FF19. By 1997, Mr. Opincar knew that Autodesk had acquired Softdesk, the maker of CAD Overlay, he was aware of AutoCAD and CAD Overlay, and he was aware of Autodesk's 1996 revenues. However, he is unclear on whether he studied Autodesk's product manuals or product brochures. *See* Trial Tr. 89:6-8, 93:14-24, 99:3-6, Apr. 9, 2013.

FF20. In a letter addressed to one or more of his attorneys dated December 9, 1997, Mr. Opincar stated: "This assumption uses the 1996 revenues of the four companies I believe have infringed on this patent, which includes Intergraph $1.1 billion, Computervision $477 million, Autodesk $496 million, and Daussault/Catia-

IBM $400 million for a total of $2.5 billion in annual revenues." *See* Trial Tr. 97:10-14, Apr. 9, 2013; Trial Ex. 203.

FF21.    The '384 reissued patent issued June 17, 2008 and expired October 4, 2011.  *See* Stipulated Fact Nos. 3, 5, ECF No. 237.

FF22.    AISI never gave notice to Autodesk of its infringement claim until it filed the present lawsuit on April 22, 2009.  *See* Trial Tr. 15:20-16:5, 16:24-17:9, Apr. 10, 2013; Stipulated Fact No. 12, ECF No. 237; AISI's Reply to Countercl. ¶ 21, ECF No. 31.

## 2.    Proposed Conclusions of Law

CL1.    AISI delayed filing suit for approximately twelve years from the time it knew or reasonably should have known of its claim against Autodesk.  AISI's unreasonable and inexcusably lengthy delay and failure to give notice have materially prejudiced Autodesk.  *See Wanless v. General Elec. Co.*, 148 F.3d 1334, 1337 (Fed. Cir. 1998).

CL2.    A delay of more than six years raises a presumption that it is unreasonable, inexcusable, and prejudicial.  *See Wanless,* 148 F.3d at 1337.

CL3.    The period of delay begins at the time the patentee has actual or constructive knowledge of the defendant's potentially infringing activities.  *See Wanless*, 148 F.3d at 1337.

CL4.    Because AISI filed the reissue application nearly ten years after the issuance of the original '393 patent, the '384 reissued patent is required to be a narrowing reissue and cannot broaden any claims.  *See* 35 U.S.C. § 251(d).

CL5.    Particularly for a narrowing reissue, the reissuance of a patent does not reset the laches period.  *Cf. Serdarevic, M.D. v. Advanced Med. Optics, Inc.*, 532 F.3d 1352, 1359 (Fed. Cir. 2008).

CL6.   Under 35 U.S.C. § 251(a), "No new matter shall be introduced into the application for reissue."

CL7.   Under 35 U.S.C. § 251(d), "No reissued patent shall be granted enlarging the scope of the claims of the original patent unless applied for within two years from the grant of the original patent."

CL8.   Under 35 U.S.C. § 252, "every reissued patent shall have the same effect and operation in law, on the trial of actions for causes thereafter arising, as if the same had been originally granted in such amended form … and the reissued patent, to the extent that its claims are substantially identical with the original patent, shall constitute a continuation thereof and have effect continuously from the date of the original patent."

CL9.   Because all of the independent claims of the '393 patent were determined to be invalid in light of SuperPaint by the Federal Circuit, among other claims, and AISI purported to narrow all of the independent claims during the reissue prosecution by amendment, there is no valid claim of the '384 reissued patent that was in the original '393 patent.  *See* 35 U.S.C. § 252.

CL10.  Because the asserted claims of the '384 reissued patent cannot be broader than the claims of the original '393 patent, AISI did not gain any new legal right to pursue an infringement claim against Autodesk in 2008 as a result of the issuance of the '384 reissued patent.  *Cf. Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1342 (Fed. Cir. 2012).

CL11.  Constructive knowledge imposes upon patent holders the duty to police their rights.  *See Wanlass*, 148 F.3d at 1339.

CL12.  AISI had constructive knowledge of its claim of infringement against Autodesk by no later than August 28, 1996 when it included Autodesk on a list of "Identified Users of the Technology."

CL13.  AISI had actual knowledge of its claim of infringement by no later than December 9, 1997 when Mr. Opincar stated that he believed Autodesk infringed the original '393 patent.

CL14.  AISI's delay until 2009 without giving notice to Autodesk of its patent infringement claim was unreasonable and prejudicial.

**B.    AISI Has No Basis To Seek Tolling of the Laches Period From 1996 to 2009.**

**1.    Proposed Findings of Fact**

FF23.    Unlike other correspondence records kept by Mr. Opincar, the letter dated August 3, 1989 that Mr. Opincar claims to have sent to Walt Spevak of Autodesk lacks any return receipt or confirmation of delivery.

FF24.    Even assuming that Mr. Opincar had sent the letter to Mr. Spevak of Autodesk, there is no record or evidence beyond Mr. Opincar's purported reconstructed memory that Ex. 34, a photocopy of three LunaSeries disks that bear completely different bates numbers from the purported letter, were actually sent to Mr. Spevak with the letter.  *See* Trial Tr. 15:15-18, Apr. 10, 2013.

FF25.    Documents produced by AISI with the Bates label prefix "AIG" or "AISREM" were produced during the Intergraph litigation.  AISI also produced documents from the Intergraph litigation with the Bates label prefix "INT."  Documents produced by AISI with the Bates label prefix "AISI" were produced only in this litigation.

FF26.    After the original '393 patent issued on October 4, 1994, Mr. Opincar asked Israel Gopstein to prepare infringement and invalidity opinions.  The infringement opinion is dated March 22, 1995, and the invalidity opinion is dated August 23, 1995.  *See* Trial Exs. 143, 144.

FF27.    The infringement opinion concluded that devices produced by Intergraph, Cadam, Computervision, and Adra literally infringe on at least one claim

of the original '393 patent. *See* Trial Tr. 237:16-22, 238:6-15, Apr. 9, 2013; Trial Ex. 143.

FF28.    Mr. Opincar did not obtain an infringement opinion on Softdesk. *See* Trial Tr. 11:5-9, Apr. 10, 2013.

FF29.    Mr. Opincar believed Softdesk could "protest" AISI's patent, but did not believe that Intergraph could protest or challenge the original '393 patent. *See* Trial Tr. 12:22-13:7, Apr. 10, 2013.

FF30.    The validity opinion prepared by Mr. Gopstein contains no reference to any version of CAD Overlay. *See* Trial Ex. 144.

FF31.    The validity opinion prepared by Mr. Gopstein contains no reference to LunaLink, LunaEdit, AutoCAD, or any public use or on-sale activity prior to the filing date. *See* Trial Ex. 144.

FF32.    On April 24, 1997, AISI filed suit against Intergraph Corporation alleging infringement of the original '393 patent. The Federal Circuit's order of dismissal was filed with the Southern District of Texas on May 4, 2004. *See* Stipulated Fact No. 4, ECF No. 237.

FF33.    Other than the typewritten shorthand notations on the October 18, 1996 list of "Identified Users of the Technology," Mr. Opincar is unable to identify any other fact or record to confirm that PriceWaterhouse did in fact contact Autodesk on AISI's behalf. *See* Trial Tr. 4:9-14, Apr. 10, 2013.

FF34.    Mr. Opincar did not add the typewritten notations on the October 18, 1996 list of "Identified Users of the Technology." *See* Trial Tr. 92:1-7, Apr. 9, 2013; Trial Ex. 578.

FF35.    On June 4, 1999 Mr. Opincar sent a letter to David Maggio of Price Waterhouse, accompanied by a receipt confirming delivery, complaining that "We provided to PriceWaterhouse a list of 26 target companies," and that "Price Waterhouse provided to us one list (dated 10-18-96) of 28 targeted companies, which

were allegedly contacted by Price Waterhouse, of the 28 companies listed, two were provided by Price Waterhouse." *See* Trial Tr. 6:4-23, Apr. 10, 2013; Trial Ex. 489.

FF36.     On July 14, 1999, Mr. Opincar sent a letter to the American Institute of Certified Public Accountants stating that PriceWaterhouse had "disregarded our letters expressing their non-performance on our contract" and complaining about the lack of work performed by PriceWaterhouse. *See* Trial Tr. 7:20-8:1, Apr. 10, 2013; Trial Ex. 177.

FF37.     AISI never provided notice to Autodesk of either the Intergraph lawsuit or the reissue prosecution.

FF38.     Prior to filing this lawsuit, AISI never provided notice to Autodesk that it believed Autodesk infringed any claim of either the original '393 patent or the '384 reissued patent. *See* Trial Tr. 15:20-16:5, 16:24-17:9, Apr. 10, 2013; Stipulated Fact No. 12, ECF No. 237.

### 2.     Proposed Conclusions of Law

CL15.  Because AISI delayed more than six years, the burden shifts to AISI to produce evidence to show that either AISI's delay was reasonable or excusable under the circumstances or that Autodesk suffered neither economic nor evidentiary prejudice.  *See Wanlass*, 148 F.3d at 1337.

CL16.  To be able to invoke the excuse of involvement in other litigation, AISI was required to give adequate notice to Autodesk of the other proceeding and of AISI's intention to enforce its patent upon completion of such other litigation.  *See Altech Controls v. E.I.L. Instrs., Inc.,* 33 F. Supp. 2d 546, 554 (S.D. Tex. 1998).

CL17.  Reissue prosecution is considered to be other litigation for which notice is required in order to toll the laches period during prosecution.  *See Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 877 (Fed. Cir. 1991).

CL18.  Because AISI never notified Autodesk of either the Intergraph litigation from April of 1997 to May of 2004 or the reissue prosecution from January of 2004 to June of 2008, and never notified Autodesk of its intention to enforce its patent at any time, AISI may not rely on the period of time it was engaged in other litigation or reissue prosecution to excuse its delay.

CL19.  AISI's delay was neither reasonable nor excusable.

## C.   AISI's Unreasonable Delay and Spoliation of Evidence Have Prejudiced Autodesk

### 1.   Proposed Findings of Fact

FF39.   Autodesk incorporates by reference all of the previous proposed findings of fact set forth above.

FF40.   Mr. Opincar worked for Eagle-Picher from 1976 until 1984.  *See* Trial Tr. 105:8-10, 105:22-23, Apr. 9, 2013.

FF41.   In August of 1987, Eagle-Picher invested one million dollars in AISI and acquired 51 percent ownership.  *See* Trial Tr. 109:6-11, Apr. 9, 2013.

FF42.   Eagle-Picher was the largest shareholder of AISI.  *See* Trial Tr. 99:17-19, 105:11-13, Apr. 9, 2013.

FF43.   In January 1990, Wylie McDonald, one of the named inventors of the patent-in-suit, gave a magnetic disk containing the source code for the LunaSeries products to an Eagle-Picher employee, David Hall, who was also a Director of AISI, in response to Mr. McDonald's concerns that the source code would be destroyed.

FF44.   According to Mr. Opincar, after AISI ceased regular business operations in January of 1990, property was taken from the offices of AISI and sold at auction "except paper and computer discs."  *See* Trial Tr. 233:11-17, 234:1-2, Apr. 9, 2013.

FF45.     Exhibit 30 contains photographs taken by Mr. Opincar of the materials that were left in AISI's office following the sheriff's sale in 1990.  *See* Trial Tr. 235:16-19, Apr. 9, 2013.

FF46.     Mr. Opincar took the materials shown in the photograph in Exhibit 30 to his house, "kept everything that was important to the invention," and discarded "stuff that I thought had no relevance to the invention," but never consulted with counsel about what to keep and what to discard.  *See* Trial Tr. 235:22-236:10, Apr. 9, 2013; Trial Tr. 18:1-3, Apr. 10, 2013.

FF47.     Apart from "accounting records," Mr. Opincar has no recollection or records of what he discarded.  In the litigation, AISI produced no records of any sales orders taken at the A/E/C Trade Show in May 2-5, 1988 or any accounting records of any sales prior to June 15, 1988 except one sales invoice dated May 24, 1988 to Computerland indicating sales of LunaLink, LunaEdit, and LunaLibrarian.

FF48.     Mr. Opincar claims not to know what is material to the patentability of AISI's patent.  *See* Trial Tr. 19:21-23, Apr. 10, 2013.

FF49.     After AISI ceased business operations in early 1990, Mr. Opincar sued Eagle-Picher, and the litigation concluded by settlement in 1995.  *See* Trial Tr. 100:3-9, Apr. 9, 2013.

FF50.     Ralph Perry-Miller, one of the attorneys to whom Mr. Opincar later conveyed his awareness of AISI's alleged patent infringement claim against Autodesk, represented AISI in its lawsuit against Eagle-Picher and again during AISI's lawsuit with Intergraph.  Mr. Perry-Miller may have also represented either Mr. Opincar or his corporate entity, AISI, in the lawsuit against AISI's former employee and named inventor, Wylie McDonald.

FF51.     From 1990 until a little after 2000, Ralph Perry-Miller was with his own firm, Perry-Miller Beasley & Hume.  Mr. Perry-Miller became a shareholder in AISI after the lawsuit against Eagle-Picher was settled as compensation for legal work

performed during the lawsuit.  Although Mr. Perry-Miller never issued any litigation hold, he did instruct Mr. Opincar to preserve documents.  *See* Trial Tr. 207:22-24, 208:13-17, 207:9-16, 209:7-12, 226:12-20, 211:11-16, Apr. 9, 2013.

FF52.    On December 9, 1994, AISI signed an agreement providing for the settlement of its lawsuit with Eagle-Picher that AISI had filed in 1990.  Trial Ex. 169.

FF53.    The December 9, 1994 settlement agreement between AISI and Eagle-Picher required Eagle-Picher to pay Mr. Opincar and Ralph Perry-Miller $525,000, and Mr. Opincar received a payment of $525,000 from Eagle-Picher.  *See* Trial Tr. 217:1-4, Apr. 9, 2013; Trial Ex. 169 at 3.

FF54.    The December 9, 1994 settlement agreement between AISI and Eagle-Picher required Eagle-Picher to transfer its shares in AISI to Mr. Opincar, and the shares were in fact transferred.  *See* Trial Tr. 217:13-22, Apr. 9, 2013; Trial Ex. 169 at 4.

FF55.    The December 9, 1994 settlement agreement between AISI and Eagle-Picher required Eagle-Picher to return "the magnetic disk that it received from the American Imaging Officers" to Mr. Opincar.  *See* Trial Tr. 218:20-22, Apr. 9, 2013; Trial Ex. 169 at 4.

FF56.    Eagle-Picher returned the magnetic disk to Mr. Opincar.  *See* Trial Tr. 101:4-9, 218:20-22, Apr. 9, 2013.

FF57.    Despite keeping only the materials that were important to his patent, Mr. Opincar has no memory of receiving a magnetic disk from Eagle-Picher as part of the settlement of the lawsuit between AISI and Eagle-Picher.  *See* Trial Tr. 236:22-23, Apr. 9, 2013.

FF58.    During discovery in the prior litigation of the original '393 patent against Intergraph, counsel for AISI contacted named inventor Wylie McDonald to obtain his assistance to retrieve data from the magnetic disk.

FF59.     In 2003 or 2004, Mr. Perry-Miller provided files from the Intergraph case to Paul Storm's law firm.  *See* Trial Tr. 228:4-9, Apr. 9, 2013.  Mr. Perry-Miller did not inspect any of those files before turning them over to Mr. Storm.

FF60.     Mr. Opincar did not give the magnetic disk to Paul Storm.  *See* Trial Tr. 102:5-6, Apr. 9, 2013.

FF61.     AISI never produced the magnetic disk to Autodesk in the present litigation.

FF62.     Mr. Opincar has no memory or any records to confirm whether there was a specification sheet describing the feature of the Luna software that Paul Bennett was asked to develop for AISI, which is referenced as being attached to the November 13, 1987 employment letter from Mr. Opincar to Paul Bennett.  *See* Trial Tr. 55:12-21, Apr. 9, 2013.

FF63.     The November 13, 1987 employment agreement between AISI and Paul Bennett, without the referenced Luna specification sheet, was provided to the United States Patent and Trademark Office ("PTO") as evidence of conception and diligence toward reduction to practice in the May 5, 2006 Declarations of Mr. Opincar and Mr. Bennett Under 37 C.F.R. § 1.131.  *See* Trial Ex. 433 at 211.

FF64.     AISI no longer has the source code for the March 15, 1988 working version of LunaLink completed by Paul Bennett.  *See* Trial Tr. 46:7-9, Apr. 9, 2013. However, a copy of the $15,000 bonus paid by Mr. Opincar to Mr. Bennett was provided to the United States Patent and Trademark Office ("PTO") as evidence of conception and diligence toward reduction to practice in the May 5, 2006 Declarations of William Opincar and Paul Bennett Under 37 C.F.R. § 1.131.  *See* Trial Ex. 433 at 212.

FF65.     AISI no longer has a copy of the version of Luna software that Mr. Bennett demonstrated at the A/E/C Systems Trade Show on May 2-5, 1988 in Chicago.  Apart from Mr. Bennett's testimony of what he demonstrated and what he

had completed by that time, there is no other record of the state of development of the Luna software or the details of the functionality that was demonstrated to the public at the A/E/C Trade Show. *See* Trial Tr. 43:13-20, Apr. 9, 2013.

FF66.    Mr. Opincar contends that he does not recall whether the "Linking CAD to the Past" flyer that AISI demonstrated at the A/E/C Systems Trade Show on May 2-5, 1988 in Chicago describes the product that was actually shipped to customers. *See* Trial Tr. 44:14-18, Apr. 9, 2013.

FF67.    Mr. Opincar emailed his attorneys on July 21, 2005 and stated "Thank you for your time yesterday.  We were discussing CAD Overlay and we must remember that their own manual for version 1.0 clearly states in three places that CAD Overlay loses registration and that the 'I fix' command must be used to align the images." *See* Trial Tr. 71:18-23, Apr. 9, 2013; Trial Ex. 488; Trial Ex. 579.

FF68.    Upon being shown the July 21, 2005 email authored by him and sent to one of his patent prosecution attorneys responsible for the reissue prosecution in which he referred to "three place [sic]" in the CAD Overlay 1.0 Manual, Mr. Opincar claimed that his email mistakenly referred to CAD Overlay 1.0 instead of CAD Overlay 2.0.

FF69.    Mr. Opincar remembers unequivocally that in June 1988 he did not review any materials relating to CAD Overlay that existed at that time, including any manuals, but Mr. Opincar cannot recall any discussions with Mr. Storm or anyone at his office regarding CAD Overlay during the reissue proceedings over fifteen years later. *See* Trial Tr. 129:22-24, 247:15-18, Apr. 9, 2013.

FF70.    Image Systems Technology demonstrated CAD Overlay at the same A/E/C Trade Show in Chicago on May 2-5, 1988. *See* Trial Ex. 137.

FF71.    Despite having attended the A/E/C Trade Show in May of 1988, Mr. Opincar contends that he did not even know about a version 1.0 of CAD Overlay. *See* Trial Tr. 66:20-22, 70:23-71:3, Apr. 9, 2013.

FF72.     George Tompkins, one of AISI's prosecution attorneys for the reissue prosecution, doubts that Mr. Opincar was confused as to whether version 1.0 or version 2.0 of CAD Overlay was being discussed during the email conversations referenced in Exhibits 488 and 579.  *See* Trial Tr. 202:7-20, Apr. 9, 2013; Trial Ex. 488; Trial Ex. 579.

FF73.     AISI performed a competitive analysis of CAD Overlay in June of 1988 noting that with CAD Overlay and AutoCAD a user can "move around the drawing and keep the raster and vector images in synch" and that "our concept is quite similar" to that of CAD Overlay.  *See* Trial Tr. 59:25-60:2, 61:4-6; Trial Ex. 135.

FF74.     Richard "Rocky" Schwartz, AISI's former trademark prosecution attorney, produced a memorandum regarding a competitive analysis of CAD Overlay dated June 23, 1988, approximately a month after the A/E/C Trade Show where AISI had demonstrated LunaLink running with AutoCAD and David Chassin had demonstrated CAD Overlay.

FF75.     Mr. Opincar claims not to recall participating in any discussions about CAD Overlay with Mr. Storm or any of his other patent prosecution attorneys for the '384 reissued patent during the reissue prosecution, despite his concern in 1996 that Softdesk, the maker of CAD Overlay, could protest his patent.  Trial Tr. 247:15-18, Apr. 9, 2013.

FF76.     AISI's June 23, 1988 CAD Overlay competitive analysis memorandum necessarily refers to a version of CAD Overlay prior to version 2.0, because CAD Overlay 2.0 was not released until August 8, 1988.  *See* Trial Tr. 251:5-15, Apr. 9, 2013; Trial Ex. 135; Trial Ex. 136 at 7-8.

FF77.     The author, addressee, subject line, and last paragraph were removed from the June 23, 1988 CAD Overlay competitive analysis memorandum produced by AISI.  The version produced by Richard Schwartz in response to Autodesk's subpoena

duces tecum was not redacted.  The paragraph removed from the version produced by

AISI reads:

> Just as we have told many prospects and customers, they too have more
> coming in the next release.  Exactly what shows is yet to be seen.  They
> have a solid understanding of the problem, as do we.  Mr. Chassin did
> an excellent job of selling the concept of overdrafting a raster image in
> the above noted article.  Our concept is quite similar.  Our approach is
> unique.

*See* Trial Tr. 64:17-19, 65:21-66:2, 68:6-11, Apr. 9, 2013; Trial Ex. 135; Trial Ex. 136.

FF78.    Mr. Opincar testified that he has never had any CAD Overlay 1.0

manuals in his possession, and that he has never reviewed any manuals relating to

CAD Overlay 1.0.  *See* Trial Tr. 247:19-24, Apr. 9, 2013.

FF79.    Mr. Opincar testified that the only CAD Overlay manual he has seen

is the one dated August 8, 1988.  *See* Trial Tr. 73:5-21, Apr. 9, 2013.

FF80.    Mr. Opincar testified that he has never seen any other CAD Overlay

manual other than Exhibit 295, which is version 2.0.  *See* Trial Tr. 28:24-29:9, Apr.

10, 2013.

FF81.    AISI produced one page of the CAD Overlay v.1.11 manual dated

March 1, 1988 and that single page is among the documents that Mr. Opincar turned

over to his counsel.  The remainder of the CAD Overlay v.1.11 Manual has not been

produced, and Autodesk has been unable to locate a copy in its files.  *See* Trial Tr.

63:1-3, Apr. 9, 2013.

FF82.    AISI had information on CAD Overlay dating back to March 1,

1988.  *See* Trial Tr. 75:18-23, Apr. 9, 2013.

FF83.    As late as 2002, Mr. Opincar possessed a computer on which a

version of CAD Overlay before June 14, 1988 had been installed.

FF84.    Autodesk acquired CAD Overlay through the acquisition of Softdesk

in December of 1996.  *See* Trial Tr. 38:15-19, Apr. 10, 2013.

FF85.     Autodesk has been unable to locate in its files any versions of the CAD Overlay manual or operational software dated before June 14, 1988 that still exists.

FF86.     Mr. Opincar worked with Israel Gopstein during the prosecution of the original '393 patent, and Israel Gopstein was the last attorney of record when the original '393 patent was issued.  *See* Trial Tr. 237:23-238:5, Apr. 9, 2013.

FF87.     After the original '393 patent issued on October 4, 1994, Mr. Opincar asked Israel Gopstein to prepare infringement and invalidity opinions.  The infringement opinion is dated March 22, 1995, and the invalidity opinion is dated August 23, 1995.  The infringement opinion concluded that devices produced by Intergraph, Cadam, Computervision, and Adra literally infringe on at least one claim of the original '393 patent.  *See* Trial Tr. 237:16-22, 238:6-15, Apr. 9, 2013; Trial Ex. 143; Trial Ex. 144.

FF88.     On March 22, 1996, Mr. Opincar sent a letter to Tommy Steele of Intergraph.

FF89.     On April 24, 1997, AISI filed suit against Intergraph Corporation alleging infringement of the original '393 patent.  The Federal Circuit's order of dismissal was filed with the Southern District of Texas on May 4, 2004.  *See* Stipulated Fact No. 4, ECF No. 237.

FF90.     AISI filed the reissue application on January 30, 2004.  *See* Stipulated Fact No. 5, ECF No. 237.

FF91.     AISI's litigation against Intergraph was dismissed on May 4, 2004.

FF92.     AISI requested a status inquiry from the PTO on May 15, 2007 stating: "Please note, too, that there is active infringement of the claims in their current form, so it is imperative that this application issue as soon as possible."  *See* Trial Tr. 172:15-22, Apr. 9, 2013; Trial Ex. 433 at 46.

-16-

FF93.    AISI filed the present lawsuit against Autodesk on April 22, 2009. *See* Stipulated Fact No. 7, ECF No. 237.

### 2.    Proposed Conclusions of Law

CL20.  A delay of more than six years raises a presumption that the delay was unreasonable, inexcusable, and prejudicial, and the presumption shifts to the patentee the burden of producing evidence, which if believed, would show that either the patentee's delay was reasonable or excusable under the circumstances or the defendant suffered neither economic nor evidentiary prejudice.  *See Wanlass,* 148 F.3d at 1337.

CL21.  Evidentiary prejudice may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts.  *See Wanlass,* 148 F.3d at 1337.

CL22.  Autodesk has been prejudiced by the loss of evidence including at least: the "attached specification sheet describing 'LUNA'" referenced in Mr. Opincar's May 2006 declaration under 37 C.F.R. § 1.131, any CAD Overlay version 1.0 manual or software, the version of LunaLink source code completed by Paul Bennett on March 15, 1988, the magnetic or "WORM" disk containing LunaSeries source code, the version of LunaLink demonstrated at the May 2-5, 1988 trade show, any beta versions of LunaEdit which Mr. Opincar alleges were operational before August 8, 1988, the initial release of AutoCAD for Macintosh released in 1988, the loss of memory of available witnesses, and the death of Robert Griggs, prosecuting attorney of the '393 patent.

CL23.  Autodesk lost the opportunity to retain early versions of CAD Overlay which may have existed in 1996 when Autodesk acquired Softdesk, the company Mr. Opincar believed could protest his patent.

CL24.  A duty to preserve evidence arises when a party knows or should know that certain evidence is relevant to pending or future litigation.  *See Ashton v. Knight Transp., Inc.*, 772 F. Supp. 2d 772, 799-800 (N.D. Tex. 2011).

CL25.  Once litigation is reasonably anticipated, a potential party to that litigation must not destroy unique, relevant evidence that might be useful to an adversary.  *See Ashton,* 772 F. Supp. 2d at 799-800.

CL26.  Bad faith has been explained as either fraudulent intent and a desire to suppress the truth, or destruction for the purpose of depriving the adversary of the evidence.  *See Ashton,* 772 F. Supp. 2d at 800-801.  Prejudice occurs when a party's ability to present its case or to defend is compromised.  *See Ashton,* 772 F. Supp. 2d at 801.

CL27.  The Court has the inherent power to sanction a party who has destroyed relevant evidence.  Spoliation occurs when a party with control over evidence had an obligation to preserve it at the time it was destroyed, the evidence was destroyed with a culpable state of mind or in bad faith, and the destroyed evidence was relevant to the party's claim or defense.  *See Ashton,* 772 F. Supp. 2d at 799-800.

CL28.  At least the following evidence was in AISI's possession during the Intergraph litigation:  a magnetic or "WORM" disk containing source code for the Luna series products, the CAD Overlay version 1.0 and 1.11 manuals, and an operational version of CAD Overlay software dated before June 14, 1988.

CL29.  AISI's duty to preserve relevant evidence was triggered at least as early as March 22, 1995 when it received an opinion of counsel concluding that Intergraph infringed at least one claim of the original '393 patent, and no later than April 24, 1997 when AISI filed suit against Intergraph alleging infringement of the original '393 patent.

CL30.  Because the reissue prosecution was filed before the Intergraph case concluded, AISI's duty to preserve relevant evidence continued throughout the reissue prosecution.

CL31.  AISI anticipated further litigation during the reissue prosecution when it represented "that there is active infringement of the claims in their current form, so it is imperative that this application issue as soon as possible" to the PTO on May 15, 2007.

CL32.  Because AISI anticipated further litigation during the reissue prosecution, its duty to preserve relevant evidence continued until the present case was filed in April 2009.

CL33.  AISI had a duty to preserve relevant evidence relating to the Luna software and the CAD Overlay prior art manuals and software since at least April 24, 1997.

CL34.  Mr. Opincar testified that he intentionally "kept everything that was important to the invention," and intentionally discarded "stuff that I thought had no relevance to the invention."

CL35.  Mr. Opincar knew that Softdesk, the maker of CAD Overlay which was acquired by Autodesk in 1996 "could protest the patent."  Files produced by Mr. Opincar contained a version of a CAD Overlay competitive analysis memorandum dated in June of 1988 that intentionally redacted highly relevant information regarding CAD Overlay.  Mr. Opincar inaccurately represented his knowledge of CAD Overlay version 1.0 during the prosecution of the '384 reissued patent.  Mr. Opincar had working installation disks of a version of CAD Overlay from before June 14, 1988, but has never produced them.  Mr. Opincar was untruthful when he said that he has never had any version of a CAD Overlay user manual other than version 2.0.  Trial Ex. 163.

CL36.  Mr. Opincar's conduct demonstrates bad faith destruction of evidence for the purpose of preventing Autodesk from acquiring relevant evidence to contest the validity of AISI's patent and defend itself in this case.

**II.     The '384 Reissued Patent Is Unenforceable Due to Inequitable Conduct**

**A.     During the Prosecution of the Original '393 Patent, AISI Failed To Disclose the Commercial Embodiment of the Claimed Invention and Material Public Use/On-Sale Bar Activity**

**1.     Proposed Findings of Fact**

FF94.     The '384 reissued patent and the original '393 patent list Paul Bennett, Mr. Opincar, and Wylie McDonald as named inventors.  *See* Stipulated Fact No. 6, ECF No. 237.

FF95.     AISI argued to the court in its prior litigation of the original '393 patent that the claimed subject matter is embodied in LunaLink and LunaEdit.  It was the function of LunaLink to overlay a raster image on top of a vector image and to keep the two images in synchronization with each other.  It was the function of LunaEdit to allow a user to "merge" or edit the two images, resulting in an edited raster file.  *See* Stipulated Fact No. 14, ECF No. 237; Trial Tr. 39:3-9, Apr. 9, 2013.

FF96.     According to the LunaSeries manual, LunaLink allows a scanned raster image to be loaded and displayed in AutoCAD, and LunaEdit performs the merging of the raster image with the AutoCAD drawing into an edited raster image or to be plotted or printed as an edited raster file.  *See* Trial Tr. 42:10-20, Apr. 9, 2013; Exhibit 35 at 10.

FF97.     LunaEdit performs the merge function.  *See* Trial Tr. 58:13-15, Apr. 9, 2013.

FF98.     Claim 26 of the original '393 patent does not recite any "merging" limitation and therefore is not directed to LunaEdit.  *See* Bennett Dep. 186:23-187:3, Apr. 16, 2010.

FF99.      The idea behind LunaLink came before LunaEdit, and Mr. Opincar does not know who came up with the idea for LunaEdit.  *See* Trial Tr. 42:21-43:2, Apr. 9, 2013.

FF100.      Mr. Opincar and Alan Thurber hired Paul Bennett in September 1987 to write code for the LunaSeries software.  *See* Trial Tr. 38:11-39:2, Apr. 9, 2013.

FF101.      Paul Bennett wrote the code for LunaLink and LunaEdit.  *See* Trial Tr. 44:24-45:2, Apr. 9, 2013.

FF102.      Mr. Opincar did not write any of the code for either LunaLink or LunaEdit and does not even have the ability to read source code.  *See* Trial Tr. 43:3-8, Apr. 9, 2013.

FF103.      Mr. Opincar asked Paul Bennett if he could create software that would display a raster image and a vector image simultaneously on a screen, and if he could do so by March 15, 1988, promised that AISI would pay Paul Bennett a bonus of $15,000.  *See* Trial Tr. 113:1-8, Apr. 9, 2013.

FF104.      Paul Bennett completed working code for LunaLink by March 15, 1988 and received the $15,000 bonus.  *See* Trial Tr. 57:6-13, Apr. 9, 2013; Trial Ex. 433 at 212.

FF105.      By March 15, 1988, AISI could display a raster image and a vector image simultaneously on the screen.  *See* Trial Tr. 44:19-23, Apr. 9, 2013.

FF106.      By March 15, 1988, AISI had decided to sell the Luna software.  *See* Trial Tr. 115:17-21, Apr. 9, 2013.

FF107.      Mr. Opincar cannot remember and does not know whether the March 15, 1988 version of LunaLink was able to maintain in registration the raster image and vector-based image and agrees that Mr. Bennett would be the best source of information on that issue.  AISI engaged Paul Bennett to be an expert witness during the Intergraph litigation.  *See* Trial Tr. 78:18-20, Apr. 9, 2013; Trial Ex. 71.

FF108.    Mr. Opincar recalls that in April 1988, he was not thinking about getting a patent for his invention, he remembers that he had not given it any thought, and he remembers that he had not really had any discussions with anyone during that period of time about trying to get a patent.  *See* Trial Tr. 117:6-13, Apr. 9, 2013.

FF109.    On April 15, 1988, AISI filed trademark applications for both LunaLink and LunaEdit, and as part of those applications, Mr. Opincar executed declarations stating that "[t]he mark was first used by Applicant in connection with the goods at least as early as March 30, 1988; was first used in interstate commerce at least as early as March 30, 1988; and is now in use in such commerce" and that "[t]he mark is used by labels affixed to the goods, packaging for such goods, and in literature used to advertise and promote such goods."  *See* Trial Tr. 115:24-116:8, 116:19-21, Apr. 9, 2013; Trial Ex. 39; Trial Ex. 40.

FF110.    AISI demonstrated LunaLink running with AutoCAD at the A/E/C Systems trade show May 2-5, 1988 in Chicago.  *See* Trial Tr. 43:9-12, Apr. 9, 2013.

FF111.    The flyer that AISI handed out at the May 2-5, 1988 trade show in Chicago identifying both LunaLink and LunaEdit was prepared in April 1988.  *See* Trial Tr. 119:14-15, Apr. 9, 2013.

FF112.    The A/E/C Trade Show for a long time was the biggest trade show for the architectural, engineering, and construction industry.  *See* Trial Tr. 31:15-20, Apr. 10, 2013.

FF113.    AISI took sales orders for both LunaLink and Luna Edit at the May 2-5, 1988 trade show in Chicago.  *See* Trial Tr. 120:19-23; 121:2-4, Apr. 9, 2013.

FF114.    According to named inventor Paul Bennett, AISI kept Luna a secret before the A/E/C Trade Show in May of 1988 because the idea was instantly recognizable to those in the industry, and one who does drawings all day long using CAD would have been able to "figure it out" using the demonstration and the

brochures that were handed out at that Trade Show.  *See* Bennett Dep. 82:20-83:21, Jun. 4, 1988.

FF115.    According to Mr. Bennett, his demonstration at the A/E/C Trade Show in May of 1988 disclosed the invention that was claimed in the original '393 patent.  *See* Bennett Dep. 82:15-19, Jun. 4, 1988.

FF116.    On May 24, 1988, AISI offered for sale LunaLink, LunaEdit, and LunaLibrarian.  *See* Trial Ex. 45(H).

FF117.    Before June 14, 1988, AutoCAD had the ability to output raster images as "slide files" using a command in AutoCAD called "MSLIDE" that allowed the user to write what was on the screen to a file and view it again.  During that time period, AutoCAD could also output what was in the AutoCAD drawing to a postscript file.  *See* Trial Tr. 37:2-10, Apr. 10, 2013.

FF118.    The MSLIDE functionality has been in AutoCAD since at least 1985.  *See* Trial Tr. 37:11-15, Apr. 10, 2013.

FF119.    In its prior litigation of the original '393 patent, the court determined that AISI's sale of LunaLink and LunaEdit in the United States on May 24, 1988 constituted a commercial offer for sale prior to the critical date.  *See* Stipulated Fact No. 15, ECF No. 237.

FF120.    According to Mr. Opincar, the application that led to the issuance of the original '393 patent was filed on June 14, 1989 because they wanted to file the patent less than one year after what he considered to be the first shipment of LunaLink.  *See* Trial Tr. 134:9-13, Apr. 9, 2013.  Thus, Mr. Opincar was aware of the concept of on-sale bar to patentability by no later than June 14, 1989.

FF121.    Mr. Opincar remembers that he told the lawyers drafting the patent application in 1989 "everything about LunaLink and LunaEdit."  *See* Trial Tr. 141:1-2, Apr. 9, 2013.

FF122.    Mr. Opincar believes that his patent attorneys were aware of LunaLink and LunaEdit during the prosecution of the original '393 patent because the same law firm that prosecuted AISI's trademark applications represented AISI during the initial stages of the prosecution.  *See* Trial Tr. 77:24-78:6, Apr. 9, 2013.

FF123.    Mr. Opincar contends that AISI disclosed information about LunaLink and LunaEdit to the United States Patent and Trademark Office by virtue of filing trademark applications with the Trademark Office.

FF124.    AISI disclosed LunaLink and LunaEdit to the PTO during the prosecution of the '384 reissued patent, but not during the prosecution of the original '393 patent.  *Compare* Trial Ex. 142 *with* Trial Ex. 433.

FF125.    During the prosecution of the '384 reissued patent, AISI submitted declarations referencing an "attached specification sheet describing 'LUNA'" from September 1987, Paul Bennett's 1987 employment contract, the March 15, 1988 check to Paul Bennett, the "Linking CAD to the Past" flyer from the May 2-5, 1988 trade show, and the May 24, 1988 sales invoice referencing LunaLink and LunaEdit.  *See* Trial Ex. 433 at 200.  None of this information was submitted to the PTO during the prosecution of the'393 patent.

### 2.    Proposed Conclusions of Law

CL37.  Prior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art.  *See Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1334 (Fed. Cir. 2012).

CL38.  The standard for establishing but-for materiality in the inequitable conduct context is a preponderance of the evidence, giving claims their broadest reasonable construction.  *See Aventis Pharma S.A.*, 675 F.3d at1334.

CL39.  Unlike other deficiencies, inequitable conduct cannot be cured by reissue.  *See Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011).

CL40.  Based on the broadest reasonable construction of the claims of the original '393 patent, AISI's May 2-5, 1988 demonstration of LunaLink and AutoCAD disclosed each of the limitations of at least independent claim 26, which does not recite any "merging" limitation, before June 14, 1988.

CL41.  Autodesk has demonstrated by a preponderance of the evidence that the PTO would not have allowed at least claim 26 of the original '393 patent if AISI did not withhold material information regarding AISI's May 2-5, 1988 demonstration of LunaLink and AutoCAD, and its May 24, 1988 sale of LunaLink.

CL42.  Based on the broadest reasonable construction of the claims of the original '393 patent, AISI's May 2-5, 1988 demonstration of LunaLink and AutoCAD disclosed "merging said first and second images to provide an edited raster image ..." through the use of the MSLIDE functionality of AutoCAD before June 14, 1988.

CL43.  Autodesk has demonstrated by a preponderance of the evidence that the PTO would not have allowed at least one of the claims of the original '393 patent if AISI did not withhold material information regarding AISI's May 2-5, 1988 demonstration of LunaLink and AutoCAD, and its May 24, 1988 sale of LunaLink, because the concept of merging the raster and vector-based images on screen would have been obvious to one of ordinary skill in the art at the time using AutoCAD's preexisting MSLIDE functionality.

CL44.  According to the 1994 version of MPEP § 2125.03:

An invention is 'on sale' if it is sold, whether the patent owner has knowledge that the sale actually includes the invention...or whether the sale is for profit...or conditional....  Furthermore, the sale of even a single device may constitute a statutory bar....  Since the statute creates a bar when an invention is placed 'on sale,' a mere offer to sell is

sufficient commercial activity...even though the offer is never actually received by a prospective purchaser.

CL45.  Because the Court in the previous litigation determined on summary judgment that AISI's sale of LunaLink and LunaEdit on May 24, 1988 constituted a commercial offer for sale, information regarding the sale of LunaLink and LunaEdit was material to the patentability of the original '393 patent.

CL46.  Pursuant to PTO procedures in 1994, AISI's sale of LunaLink and LunaEdit to Computerland on May 24, 1988 constituted material on-sale bar activity. *See* MPEP § 2125.03 (1994).

CL47.  "[A]ctual delivery or present ability to deliver commercial quantities of an invention is not a prerequisite to a prima facie case [of on-sale bar] under 35 U.S.C. § 102(b)."  *See* MPEP § 2125.03 (1994).

CL48.  An invention can be ready for patenting even when the software program has not yet been written if the explanation of the invention was sufficiently specific to enable a programmer to understand the invention and write the software needed to implement it.  *See Robotic Vision Syst., Inc. v. View Eng'g, Inc.*, 249 F.3d 1307, 1311 (Fed. Cir. 2001).

CL49.  LunaLink and LunaEdit were ready for patenting by no later than May 2-5, 1988 when LunaLink and LunaEdit were described in the "Linking CAD to the Past" flyer distributed at the A/E/C trade show, and as early as April 1988 when the flyer itself was prepared.

CL50.  Autodesk has demonstrated by a preponderance of the evidence that the PTO would not have allowed at least one of the claims of the original '393 patent based on on-sale bar if AISI did not withhold material information regarding the May 2-5, 1988 trade show, and material information regarding the offer for sale of LunaLink and LunaEdit on May 24, 1988.

CL51.  The standard for satisfying the intent requirement is clear and convincing evidence.  *See Aventis Pharma S.A.*, 675 F.3d at 1335.

CL52.  Inequitable conduct requires proof of a specific intent to deceive the PTO, where the specific intent is the single most reasonable inference to be drawn from the evidence.  *Aventis Pharma S.A*, 675 F.3d at 1335.

CL53.  Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence.  *See Therasense, Inc.*, 649 F.3d at 1290.

CL54.  Mr. Opincar knew about the concept of on-sale bar in 1989 and he was aware of material information regarding LunaLink and LunaEdit that was not disclosed to the PTO.  The only reasonable inference is that AISI intended to deceive the PTO by withholding material information showing that at least LunaLink was reduced to practice before June 14, 1988 and that LunaLink and LunaEdit were on-sale and ready for patenting before June 14, 1988.

**B.  During the Prosecution of the '384 Reissued Patent, AISI Intentionally Misled the Examiner Regarding the Operation of SuperPaint 1.0**

**1.  Proposed Findings of Fact**

FF126.    On June 12, 2000, the Federal Circuit held that all but four claims of the original '393 patent were either anticipated or obvious as a matter of law in light of SuperPaint 1.0.  *See* Trial Ex. 501 at 3671.

FF127.    SuperPaint was a focal point of the reissue prosecution because it was relied on by the Federal Circuit to invalidate most of the claims of the original '393 patent.  *See* Trial Tr. 185:17-20, Apr. 9, 2013.

FF128.    William Snider is the sole author, developer, and programmer of SuperPaint 1.0, a program for Macintosh that was published in 1987.  *See* Trial Tr. 50:14-17, 53:24-54:3, Apr. 10, 2013.

FF129.    William Snider demonstrated SuperPaint at the Macworld computer show in San Francisco in January of 1986.  *See* Trial Tr. 54:14-20, Apr. 10, 2013.

FF130.    MacPaint was a raster-based graphics creation program that was included with Macintosh computers in the 1980s.  *See* Trial Tr. 52:4-10, Apr. 10, 2013.

FF131.    SuperPaint 1.0 can display raster images, and users can use graphics tools to edit those raster images. *See* Trial Tr. 38:4-5, Apr. 9, 2013; 53:10-23, Apr. 10, 2013.

FF132.    SuperPaint 1.0 is a graphics creation and editing program with a raster graphics editing mode and vector graphics editing mode, where the raster graphics layer and vector graphics layer overlay each other like transparent sheets.  *See* Trial Tr. 55:21-56:15, Apr. 10, 2013.

FF133.    SuperPaint 1.0's work area is defined by an eight-inch by ten-inch document for the purpose of creating graphics documents that can be printed.  *See* Trial Tr. 56:16-57:5, Apr. 10, 2013.

FF134.    The paint layer, or raster layer, in SuperPaint 1.0 can import any raster image, such as a photo or a scanned document, while the draw layer, or vector layer, utilizes vector objects such as a rectangle, a circle, or a line, which the user can move, stretch, rotate, and place wherever the user wanted within the document.  *See* Trial Tr. 57:8-58:4, Apr. 10, 2013.

FF135.    In SuperPaint 1.0, an object in the vector layer is stored by saving the numerical locations sufficient to describe the file and recreate the rendered image on the screen.  *See* Trial Tr. 93:22-94:12, Apr. 10, 2013.

FF136.    In the vector layer in SuperPaint 1.0, the beginning and ending points of the lines are referenced to the SuperPaint coordinate system, which is a Cartesian coordinate system based on x and y axes, with an origin defined by the point "0,0" where the axes intersect.  *See* Trial Tr. 58:5-24, Apr. 10, 2013.

FF137.    SuperPaint 1.0 used the same "0,0" point or origin for both the raster layer and the vector layer.  *See* Trial Tr. 58:25-59:4, Apr. 10, 2013.

FF138.    SuperPaint 1.0 does not have a separate raster origin and vector origin.  *See* Trial Tr. 94:17-95:2, Apr. 10, 2013.

FF139.    In SuperPaint 1.0, the raster layer and the vector layer are registered to each other and to the SuperPaint coordinate system in a fixed manner at all times. SuperPaint keeps the vector layer and the raster layer fixed to the same coordinate systems at all times.  *See* Trial Tr. 59:5-9, 62:8-24, Apr. 10, 2013.

FF140.    SuperPaint 1.0's coordinate system is applied uniformly to both layers.  *See* Trial Tr. 75:18-23, Apr. 10, 2013.

FF141.    If a user of SuperPaint 1.0 places the vector layer on top of the raster layer, chooses the "Select All" menu item, and then moves a vector object, the origin never moves.  *See* Trial Tr. 63:8-65:24, Apr. 10, 2013.

FF142.    In SuperPaint 1.0, a pan function is initiated by using the scroll bar, using the hand tool to move a document up, down, left, or right, or through "auto-scrolling" while drawing vector objects.  For example, when drawing a line and moving the mouse button to the edge of the screen with the mouse button depressed, the auto-scrolling function will pan the screen in the direction of the mouse and allow the user to continue to draw the line.  *See* Trial Tr. 59:15-23, 61:6-22, Apr. 10, 2013.

FF143.    The SuperPaint 1.0 User Manual states that "the best way to learn how the scroll bars work is to experiment with them."  Ex. 501 at 3582.

FF144.    During a pan function in SuperPaint 1.0, regardless of whether a document is moved up, down, left, or right, the raster layer and vector layer are always stuck together in a fixed manner.  *See* Trial Tr. 59:10-14, 59:24-60:1, Apr. 10, 2013.

FF145.    A computer with a graphical user interface utilizes a rendering engine, and the purpose of the rendering engine is to allow the program to display graphics on a pixel-based screen.  *See* Trial Tr. 93:1-21, Apr. 10, 2013.

FF146.    AutoCAD for Macintosh was first released in late 1988 or early 1989, and Autodesk stopped supporting AutoCAD for Macintosh after the 1992 release.  Autodesk began designing a later version of AutoCAD for Macintosh in 2008 and released it in 2010.  *See* Trial Tr. 31:21-32:1, 33:17-21, Apr. 10, 2013.

FF147.    Both SuperPaint and AutoCAD for Macintosh in the 1988 and 1989 timeframe used Quickdraw to render the graphics. *See* Trial Tr. 32:2-12, 83:10-12, Apr. 10, 2013.

FF148.    William Snider created a video declaration in the Intergraph case in which he reproduced the actions that were described in the original '393 patent using SuperPaint 1.0, including taking a raster image and using vector edits to modify that raster image, then saving the image, printing the image, and opening the saved image file.  *See* Trial Tr. 60:8-20, Apr. 10, 2013.

FF149.    During William Snider's video demonstration of SuperPaint 1.0, Mr. Snider also scanned a floor plan of a building, opened the picture as a raster image in SuperPaint's paint layer, modified the raster image using vector edits in SuperPaint's draw layer, combined the vector edits from the draw layer into the raster layer, saved it, printed it, and reopened it.  *See* Trial Tr. 60:18-61:5, Apr. 10, 2013.

FF150.    During William Snider's video demonstration of SuperPaint 1.0, Mr. Snider drew an arc using the vector drawing functionality, and while drawing the vector arc, the autoscroll function of SuperPaint caused the screen to pan downward. The raster image and vector-based objects stayed in registration during the panning. *See* Trial Tr. 61:23-62:7, Apr. 10, 2013.

FF151.    According to Mr. Opincar, his attorneys knew of the video declaration of William Snider demonstrating the operation of SuperPaint 1.0 but he claims to not recall whether he showed them the video or handed the video over to his patent prosecution attorneys.  *See* Trial Tr. 96:22-97:3, Apr. 9, 2013.

FF152.    AISI retained Paul Storm to represent AISI during the Intergraph litigation after the Federal Circuit opinion.  *See* Trial Tr. 243:21-244:5, Apr. 9, 2013.

FF153.    Mr. Opincar had a conversation with Paul Storm about the SuperPaint video demonstration by Mr. Snider.  *See* Trial Tr. 244:18-245:9, Apr. 9, 2013.

FF154.    The video declaration of Mr. Snider demonstrating the various operations of SuperPaint 1.0 was not shown to the PTO.  *See* Trial Tr. 96:5-7, Apr. 9, 2013.

FF155.    The references submitted to the PTO in the July 23, 2004 Information Disclosure Statement were chosen based on what had happened in the AISI v. Intergraph litigation.  *See* Trial Tr. 188:17-25, 189:7-11, Apr. 9, 2013; Trial Ex. 433 at 309.

FF156.    The maintain in registration claim limitation was not discussed in the court documents submitted to the PTO during the reissue prosecution of the '384 reissued patent because that limitation was not specifically claimed in the original '393 patent.  *See* Trial Tr. 95:5-17, Apr. 10, 2013.

FF157.    At the time of the February 9, 2006 interview with the Examiner, Mr. Opincar had in his possession the video declaration of Mr. Snider demonstrating different operations of SuperPaint.  *See* Trial Tr. 95:14-17, Apr. 9, 2013.

FF158.    Mr. Opincar relied on Mr. Storm to make the decision to perform a demonstration of SuperPaint himself rather than to provide the video demonstration of the operations of SuperPaint by Mr. Snider.  *See* Trial Tr. 21:4-17, Apr. 10, 2013.

FF159.    George Tompkins and John Patti, two of the attorneys who prosecuted the '384 reissued patent, make it their practice to explain to their clients an applicant's duty of candor and duty to disclose material information to the PTO.  *See* Trial Tr. 154:4-6, 154:7-21, 155:8-10, 183:1-6, Apr. 9, 2013.

FF160.    George Tompkins has no recollection of ever receiving or seeing a videotape of Mr. Snider's demonstration of the operations of SuperPaint.  *See* Trial Tr. 188:11-16, Apr. 9, 2013.

FF161.    On February 9, 2006, Paul Storm, George Tompkins, John Patti, and William Opincar attended an in-person meeting with the patent examiner, Phu K. Nguyen, to discuss why the claims 1 and 14 of the '384 reissued patent should be allowed.  *See* Trial Tr. 190:25-191:9, Apr. 9, 2013; Trial Ex. 433 at 247-248.

FF162.    During the February 9, 2006 in-person meeting with the patent examiner, Mr. Opincar demonstrated LunaLink running with AutoCAD and SuperPaint, but not LunaEdit.  *See* Trial Tr. 95:1-13, 191:14-15, Apr. 9, 2013.

FF163.    Mr. Opincar made the presentation of SuperPaint to the patent examiner during the in-person interview on February 9, 2006.  *See* Trial Tr. 246:3-5, Apr. 9, 2013.

FF164.    Mr. Opincar went to the in-person interview to demonstrate that SuperPaint does not maintain in registration.  *See* Trial Tr. 20:5-10, Apr. 10, 2013.

FF165.    The purpose of Mr. Opincar's demonstration at the PTO was to show that SuperPaint 1.0 "does not maintain registration between the draw layer and the paint layer."  *See* Trial Tr. 102:8-10, Apr. 10, 2013.

FF166.    Mr. Opincar does not remember discussing the SuperPaint demonstration with Paul Storm before making the presentation to the patent examiner. *See* Trial Tr. 246:16-18, Apr. 9, 2013.

FF167.    Mr. Opincar does not recall whether anyone asked questions of him while he made the presentation.  *See* Trial Tr. 246:23-25, Apr. 9, 2013.

FF168.    Mr. Opincar portrayed SuperPaint to the examiner "in a way that would be compared to the invention."  *See* Trial Tr. 247:6-9, Apr. 9, 2013.

FF169.    Mr. Opincar does not know what is material to the patentability of his patent.  *See* Trial Tr. 19:21-23, Apr. 10, 2013.

FF170.    According to Mr. Opincar, during the demonstration with the patent examiner, he "selected all the items in the draw layer, which would have been everything in the draw layer, including the draw layer origin, and invoked a move command and moved the draw layer and the pixels did not follow."  *See* Trial Tr. 246:6-246:15, Apr. 9, 2013.

FF171.    Mr. Opincar testified that when a user chooses the "select all" menu function in SuperPaint 1.0., the user selects the entire draw layer, and any subsequent move operation in the draw layer would "move[] the vector origin."  *See* Trial Tr. 103:5-15, Apr. 10, 2013.

FF172.    The "select all" menu function in SuperPaint selects the objects in the draw layer.  *See* Ex. 501.

FF173.    During Mr. Opincar's demonstration of SuperPaint 1.0, the raster layer and vector layer stayed in registration. *See* Trial Tr. 65:25-66:12, Apr. 10, 2013.

FF174.    AISI's position in this case is that the raster layer and the vector layer "maintain a form of registration between images."  *See* ECF No. 141 at 5.

FF175.    Mr. Opincar did not demonstrate any of the panning or scrolling functions available in SuperPaint 1.0, which would have shown that the raster and vector layers stay maintained in registration with each other while scrolling up, down, left, or right.  *See* Trial Tr. 66:13-25, 101:5-102:7, Apr. 10, 2013.

FF176.    During the demonstration at the PTO, if Mr. Opincar would have drawn the same two lines to form an "x" in SuperPaint 1.0, one in the raster layer and one in the vector layer, and scrolled the screen left, right, up, or down, the two lines would have stayed maintained in registration with each other.  *See* Trial Tr. 104:12-23, Apr. 10, 2013.

FF177.    Mr. Opincar did not demonstrate the zoom function of SuperPaint 1.0 to the PTO, which would have shown that the raster layer and objects in the vector layer stay maintained in registration.  *See* Trial Tr. 102:11-19, Apr. 10, 2013.

FF178.     During the demonstration at the PTO, if Mr. Opincar would have drawn the same two lines to form an "x" in SuperPaint 1.0, one in the raster layer and one in the vector layer, and zoomed in on the "x," the two lines would have stayed maintained in registration with each other.  *See* Trial Tr. 104:24-105:5, Apr. 10, 2013.

FF179.     Mr. Opincar did not demonstrate the two-layer selection tool of SuperPaint 1.0 to the PTO, which would have shown that the raster layer and the objects in the vector layer stay maintained in registration.  *See* Trial Tr. 103:19-104:8, Apr. 10, 2013.

FF180.     Mr. Opincar demonstrated a version of LunaLink running with AutoCAD Release 10 during the in-person meeting at the PTO.  *See* Trial Tr. 107:20-108:1, Apr. 10, 2013.

FF181.     Before the demonstration, Mr. Opincar practiced zoom and pan in AutoCAD.  *See* Trial Tr. 107:1-10, Apr. 10, 2013.

FF182.     Mr. Opincar demonstrated the zoom and pan features of AutoCAD Release 10 running with LunaLink, but did not demonstrate the move function.  Using the move function in AutoCAD running with LunaLink, a user can move a vector object without also moving the raster image.  *See* Trial Tr. 111:8-112:6, 112:8-22, Apr. 10, 2013.

FF183.     Mr. Opincar does not know the command to erase a vector image in AutoCAD.  *See* Trial Tr. 110:17-19, Apr. 10, 2013.

## 2.      Proposed Conclusions of Law

CL55.  Prior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art.  *See Aventis Pharma S.A.,* 675 F.3d at 1334.

CL56.  The standard for establishing but-for materiality in the inequitable conduct context is preponderance of the evidence, giving claims their broadest reasonable construction.  *See Aventis Pharma S.A.*, 675 F.3d at1334.

CL57.  When a claim is properly invalidated based on the deliberately withheld prior art, then that prior art is necessarily material for the purposes of the inequitable conduct inquiry.  *See Aventis Pharma S.A.*, 675 F.3d at 1334.

CL58.  Even if a withheld reference is not sufficient to invalidate the claim in district court, the reference may be material if it would have blocked patent issuance under the PTO's different evidentiary standards.  *See Aventis Pharma S.A.*, 675 F.3d at 1334.

CL59.  Because the Federal Circuit held in 2000 that all but four dependent claims of the original '393 patent were invalid in light of SuperPaint 1.0, the only relevant limitations for determining materiality of information relating to SuperPaint 1.0 are the "maintain in registration" limitations added to the amended claims during the prosecution of the '384 reissued patent.

CL60.  Both the operational details of SuperPaint and the video declaration of William Snider submitted in support of Intergraph's motion for summary judgment are necessarily material to the '384 reissued patent because they were relied on by the Southern District of Texas and the Federal Circuit in holding that the claims of the original '393 patent were invalid in light of SuperPaint 1.0.

CL61.  Based on the broadest reasonable construction of the claims of the '384 reissued patent, SuperPaint 1.0 discloses "said second image being displayed in a window having coordinates referenced to a vector origin wherein said first image is maintained in registration with said second image using said coordinates."

CL62.  Autodesk has demonstrated by a preponderance of the evidence that the PTO would not have allowed at least one of the amended claims of the '384 reissued

patent if Mr. Opincar had not deliberately misled the examiner regarding the operational details of SuperPaint 1.0, LunaLink, and AutoCAD.

CL63.  Autodesk has demonstrated by a preponderance of the evidence that the PTO would not have allowed at least one of the amended claims of the '384 reissued patent if Mr. Opincar had not withheld material information regarding the operational details of SuperPaint 1.0, LunaLink, and AutoCAD.

CL64.  The standard for satisfying the intent requirement is clear and convincing evidence.  *See Aventis Pharma S.A.*, 675 F.3d at 1335.

CL65.  Inequitable conduct requires proof of a specific intent to deceive the PTO, where the specific intent is the single most reasonable inference to be drawn from the evidence.  *See Aventis Pharma S.A.*, 675 F.3d at 1335.

CL66.  Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence.  *See Therasense, Inc.*, 649 F.3d at 1290.

CL67.  Mr. Opincar knew that the operational details of SuperPaint and the declaration of William Snider were both material to his invention.

CL68.  Mr. Opincar tasked himself to make the demonstration to the PTO.

CL69.  Mr. Opincar intentionally chose to demonstrate the move function in SuperPaint and the pan function in AutoCAD in a way that misled the examiner to believe that  SuperPaint was unable, but LunaLink and AutoCAD were able, to maintain in registration the raster image and the vector-based image.

CL70.  Mr. Opincar intentionally chose not to demonstrate the scroll (*i.e.*, pan) function  of SuperPaint, which would have shown that SuperPaint was able to maintain in registration the raster image and the vector-based image.

CL71.  Mr. Opincar intentionally chose not demonstrate the zooming function of SuperPaint, which would have shown that the raster image and the vector-based

image are maintained in registration, but chose to demonstrate the zooming function only in his demonstration of LunaLink and AutoCAD.

CL72.   The only reasonable inference is that Mr. Opincar intentionally demonstrated different operations of SuperPaint 1.0 and LunaLink in order to mislead the patent examiner into thinking that SuperPaint could not "maintain in registration" as claimed in the '384 reissued patent and that LunaLink could "maintain in registration" as claimed in the '384 reissued patent.

CL73.   The only reasonable inference is that AISI intentionally withheld the video declaration of William Snider, the inventor of SuperPaint, and chose instead to perform a misleading demonstration of SuperPaint 1.0.

**C.      During the Prosecution of the '384 Reissued Patent, AISI Intentionally Misrepresented Facts Regarding the Claimed Invention To Predate CAD Overlay 2.0 and Avoid On-Sale Bar**

**1.      Proposed Findings of Fact**

FF184.    CAD Overlay 1.0 was released February 12, 1988.

FF185.    CAD Overlay 2.0 was released August 8, 1988.

FF186.    During the February 9, 2006 in-person interview with the examiner, AISI stated that it would provide a declaration pursuant to 37 C.F.R. § 1.131 to predate CAD Overlay 2.0 and remove the reference as prior art.  *See* Trial Ex. 45 at 305.

FF187.    The May 5, 2006 Supplemental Preliminary Amendment states that "Applicants submit herewith declarations under 37 C.F.R. § 1.131 of inventors Mr. Opincar, Paul Bennett, and Wylie McDonald ("131 declarations") to establish that Applicant conceived of and reduced to practice the present invention prior to CAD Overlay's publication date of August 8, 1988.  Accordingly, Applicants respectfully assert that the 131 declarations obviate any rejection under 35 U.S.C. § 102 or § 103."  *See* Trial Ex. 433 at 150.

FF188.    In both the prior litigation and in this litigation, AISI has argued that LunaLink and LunaEdit together embody the claimed invention of the original '393 patent and the '384 reissued patent.  It was the function of LunaLink to overlay a raster image on top of a vector image and to keep the two images in synchronization with each other.  It was the function of LunaEdit to allow a user to "merge" or edit the two images, resulting in an edited raster file.  *See* Stipulated Fact No. 14, ECF No. 237; Trial Tr. 39:3-9, Apr. 9, 2013.

FF189.    According to the LunaSeries manual, LunaLink allows a scanned raster file to be loaded and displayed in AutoCAD, and LunaEdit performs the merging of AutoCAD drawing files into raster images.  *See* Trial Tr. 42:10-20, Apr. 9, 2013; Trial Ex. 35 at 10.

FF190.    LunaEdit is the product that performs the merging function.  *See* Trial Tr. 58:13-15, Apr. 9, 2013.

FF191.    In the declarations submitted by the named inventors, the only evidence of conception and reduction to practice relates to LunaLink and the only product referenced is LunaLink.  Neither the declarations nor the Remarks accompanying the declarations reference LunaEdit.  *See* Trial Ex. 433 at 150, 184-215.

FF192.    Mr. Opincar understood the meaning of Paragraph 11 of the Declaration of Mr. Opincar Under 37 C.F.R. § 1.131, and Mr. Opincar's understanding of "reduced to practice" means that it works.  *See* Trial Tr. 49:7-11, 54:10-55:4, Apr. 9, 2013; Trial Ex. 433 at 200.

FF193.    AISI began shipping LunaLink prior to August 8, 1988, but AISI did not ship copies of LunaEdit prior to August 8, 1988.  *See* Trial Tr. 57:23-58:9, Apr. 9, 2013; Trial Ex. 433 at 213.

FF194.    As of November 28, 1988, AISI did not have LunaEdit ready to ship.  *See* Trial Tr. 52:4-6, Apr. 9, 2013; Trial Ex. 66.

-38-

FF195.    The only record that any version of LunaEdit was reduced to practice before August 8, 1988 is a memorandum dated August 3, 1988 indicating a target completion date for a Beta, or test, version of LunaEdit by August 23, 1988.  *See* Trial Tr. 49:16-24, 50:7-10, Apr. 9, 2013; Trial Ex. 78.

FF196.    AISI has fallen behind on software development schedules.  *See* Trial Tr. 50:4-6, Apr. 9, 2013.

FF197.    As of October 2, 1988, LunaEdit was still in beta testing.  *See* Trial Tr. 133:1-5, Apr. 9, 2013; Trial Ex. 80.

FF198.    The initial public release of LunaEdit for AutoCAD was November 29, 1988.  *See* Trial Tr. 126:25-127:2, Apr. 9, 2013; Trial Ex. 74.

FF199.    There is no evidence of diligence toward reduction to practice or any date for actual reduction to practice provided in the declarations.  *See* Trial Ex. 433 at 184-215.

FF200.    Other than the evidence provided in the declarations of the named inventors under 37 C.F.R. § 1.131, all of which relate to LunaLink, there is no evidence of any other actual reduction to practice.  *See* Trial Tr. 55:16-20, Apr. 9, 2013; Trial Ex. 433.

FF201.    Mr. Opincar was aware of CAD Overlay by June 1988 because he saw CAD Overlay at the A/E/C trade show May 2-5, 1988 in Chicago.  *See* Trial Tr. 59:6-13, 130:11-12, Apr. 9, 2013.

FF202.    No version of CAD Overlay was disclosed to the PTO in the '393 prosecution.  *See* Trial Tr. 70:13-15, Apr. 9, 2013.

FF203.    The basis for Mr. Opincar's belief that the competitive analysis of CAD Overlay was given to AISI's attorneys that prosecuted the original '393 patent is that it was found in Richard Schwartz's files. *See* Trial Tr. 130:15-20, Apr. 9, 2013.

FF204.    Richard Schwartz once worked for the law firm Glazier Griggs and Schwartz, which ceased to exist in 1994, and then transferred to the law firm of Akin Gump until 2000.  *See* Trial Tr. 144:10-15, Apr. 9, 2013.

FF205.    In response to Autodesk's subpoena, Richard Schwartz turned responsive documents over to AISI's attorneys.  *See* Trial Tr. 145:14-17, Apr. 9, 2013.

FF206.    Mr. Schwartz worked on trademark prosecution for select clients but he has not been involved in any patent prosecution work in the late 1980s.  *See* Trial Tr. 145:13-18, 148:15-21, Apr. 9, 2013.

FF207.    Richard Schwartz did not represent AISI in obtaining the '393 patent.

FF208.    Mr. Opincar testified that he did not even know CAD Overlay version 1.0 during the reissue prosecution, and that is still his testimony.  *See* Trial Tr. 66:20-22, 70:23-71:3, Apr. 9, 2013.

FF209.    Mr. Opincar does not recall participating in any discussions with Mr. Storm or anyone at his office regarding CAD Overlay during the reissue proceedings. *See* Trial Tr. 247:15-18, Apr. 9, 2013.

FF210.    On July 21, 2005, Mr. Opincar sent an email to Paul Storm stating "We were discussing CAD Overlay and we must remember that their own manual for version 1.0 clearly states in three places that CAD Overlay loses 'registration' and that the 'I Fix' command must be used to align the images."  *See* Trial Tr. 195:11-19, Apr. 9, 2013; Trial Ex. 488.

FF211.    The "I Fix" command is also discussed in the June 23, 1988 competitive analysis memorandum of CAD Overlay: "There is an IFIX(?) command that restores raster / vector synch."  *See* Trial Ex. 135.

FF212.    On November 8, 2006, George Tompkins requested a copy of the version 1.0 CAD Overlay manual and stated that "we should submit a copy to the

examiner.  I have looked through our files, and only found a copy of the version 2.0 manual."  *See* Trial Tr. 193:13-24, Apr. 9, 2013; Trial Ex. 579.

FF213.    AISI has no copies of letters from customers complaining that CAD Overlay could not maintain in registration before AISI filed its patent.  *See* Trial Tr. 59:14-24, Apr. 9, 2013.

FF214.    AISI told the PTO that versions of CAD Overlay existing before June 14, 1988 "did <u>not</u> register the raster image with the AutoCAD vector file," but the June 23, 1988 memorandum states "IZOOM is the only command available to move around the drawing and keep the raster and vector images in synch."  *See* Trial Ex. 433 at 376; Trial Ex. 135.

FF215.    AISI told the PTO that versions of CAD Overlay existing before June 14, 1988 did not "include editing or merging capabilities" but the February 12, 1988 CAD Overlay press release states "By overlaying CAD and raster images, CAD Overlay allows the user to merge pictorial sketches, renderings, or photocopies with AutoCAD drawings, creating a new hybrid drawing."  *See* Trial Ex. 433 at 377; Trial Ex. 501 at 1920.

FF216.    CAD Overlay 2.0, not CAD Overlay 1.0, was disclosed to the PTO during the prosecution of the '384 reissue patent.  *See* Trial Tr. 70:4-7, Apr. 9, 2013.

## 2.    Proposed Conclusions of Law

CL74.  According to 37 C.F.R. § 1.131, an inventor declaration must be supported by factual evidence establishing invention of the claimed subject matter prior to the effective date of issuance.  To be an effective 131 declaration, if there has not been a reduction to practice prior to the effective date of the reference, "reasonable diligence" must be established via factual evidence and a showing of specific dates. *See* MPEP § 715.07 (Aug. 2005).

CL75.  "[W]here an affidavit or declaration is submitted by an applicant under 37 C.F.R. § 1.131 to swear behind a reference, such an affidavit or declaration may constitute, among other things, an admission that an invention was 'complete' more than one year before the filing of an application."  *See* MPEP § 2125.01.

CL76.  Because the only evidence provided along with AISI's 131 inventor declarations relates to the LunaLink product, if the 131 declarations "establish that Applicant conceived of and reduced to practice the present invention prior to CAD Overlay's publication date of August 8, 1988," then the '384 reissued patent is invalid for on-sale bar.  AISI cannot dispute that LunaLink was in public use and on sale before June 14, 1988.  *See* Trial Ex. 433 at 150.

CL77.  To the extent AISI maintains that the claimed invention is not subject to on-sale bar, then the 131 inventor declarations are materially misleading on their face.

CL78.  Prior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art.  *See Aventis Pharma S.A.*, 675 F.3d at 1334 (Fed. Cir. 2012).

CL79.  The standard for establishing but-for materiality in the inequitable conduct context is preponderance of the evidence, giving claims their broadest reasonable construction.  *See Aventis Pharma S.A.*, 675 F.3d at 1334.

CL80.  Based on the broadest reasonable construction of the claims of the '384 patent, CAD Overlay and AutoCAD disclosed each of the limitations of at least independent claims 26 and 98 before June 14, 1988, which do not recite any "merging" limitation.

CL81.  Based on the broadest reasonable construction of the claims of the '384 patent, CAD Overlay and AutoCAD disclosed "merging said first and second images to provide an edited raster image ..." before June 14, 1988.  *See* Trial Ex. 51, 11:18-23.

CL82.  Autodesk has demonstrated by a preponderance of the evidence that the PTO would not have allowed at least one of the amended claims of the '384 reissued

patent if Mr. Opincar did not withhold material information regarding the operational details of versions of CAD Overlay available before June 14, 1988 for use with AutoCAD.

CL83.  The standard for satisfying the intent requirement is clear and convincing evidence.  *See Aventis Pharma S.A.*, 675 F.3d at 1335.

CL84.  Inequitable conduct requires proof of a specific intent to deceive the PTO, where the specific intent is the single most reasonable inference to be drawn from the evidence.  *See Aventis Pharma S.A.*, 675 F.3d at 1335.

CL85.  Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence.  *See Therasense, Inc.*, 649 F.3d at 1290.

CL86.  The only reasonable inference is that AISI intentionally submitted materially misleading inventor declarations to remove CAD Overlay as prior art.

CL87.  Mr. Opincar knew of CAD Overlay during the reissue prosecution, possessed at least one page of a CAD Overlay version 1.11 user manual around the time of the reissue prosecution, and possessed a computer on which an early version of CAD Overlay had been installed.  Mr. Opincar produced a document with improper redactions of information demonstrating AISI's knowledge that CAD Overlay addressed the "same problem" as AISI's Luna product as of June 1988.

CL88.  The only reasonable inference is that AISI intentionally misrepresented the functionalities of CAD Overlay prior to June 14, 1988 and intentionally withheld information in its own files that would have shown CAD Overlay could maintain in registration raster and vector-based images before June 14, 1988.

III.   **Autodesk Should Be Permitted To Continue Manufacturing and Selling AutoCAD Pursuant to the Doctrine of Equitable Intervening Rights**

1.   **Proposed Findings of Fact**

FF217.   Autodesk was formed in 1982.  Autodesk's headquarters is located at 111 McInnis Parkway, San Rafael, California.  *See* Stipulated Fact No. 2, ECF No. 237.

FF218.   AISI alleges infringement of claims 14, 15, 108, and 114 of the '384 reissued patent based solely on the functionality of AutoCAD, and either party may use the functionality of AutoCAD 2011 to prove infringement or non-infringement with respect to the following accused products:  any version of AutoCAD, AutoCAD LT, AutoCAD Map 3D, AutoCAD Architecture, AutoCAD Civil, AutoCAD Civil 3D, AutoCAD Electrical, AutoCAD Land Desktop, AutoCAD Mechanical, AutoCAD MEP, AutoCAD P&ID, AutoCAD Plant 3D, or AutoCAD Structural Detailing made, used, or sold by Autodesk on or after June 17, 2008.  *See* Stipulated Fact Nos. 8, 9, ECF No. 237.

FF219.   Image Systems Technology, the company that created CAD Overlay, was acquired by Softdesk in 1994.  *See* Trial Tr. 38:20-39:1, Apr. 10, 2013.

FF220.   Autodesk acquired CAD Overlay through the acquisition of Softdesk in December of 1996.  *See* Trial Tr. 38:15-19, Apr. 10, 2013.

FF221.   AutoCAD Raster Design used to be called CAD Overlay.  *See* Trial Tr. 38:13-14, Apr. 10, 2013.

FF222.   According to Abhijit Oak, who began using AutoCAD in 1985 and began working at Autodesk in 1996, AutoCAD has had the functionality to attach raster images since Release 14, which was released in February of 1997.  *See* Trial Tr. 30:13-19, 30:24-31:1, 37:18-22, Apr. 10, 2013.

FF223.    Before 2003, Autodesk released new versions of AutoCAD every one-and-a-half to two years.  Since 2004, Autodesk has released new versions of AutoCAD on an annual basis.  *See* Trial Tr. 31:2-8, Apr. 10, 2013.

FF224.    Over forty engineers work on test development and quality assurance for the AutoCAD product alone.  *See* Trial Tr. 40:7-10, Apr. 10, 2013.

FF225.    The '384 reissued patent expired October 4, 2011. Stipulated Fact Nos. 3, 5, ECF No. 237.

FF226.    There are no valid claims of the original '393 patent that are also in the '384 reissued patent

FF227.    The asserted claims of the '384 reissued patent are required to be narrower in scope than the claims of the original '393 patent.  *See* Trial Ex. 433 at 375.

### 2.    Proposed Conclusions of Law

CL89.  Pursuant to 35 U.S.C. § 252:

> The court before which such matter is in question may provide for the continued manufacture, use, offer for sale, or sale of the thing made, purchased, offered for sale, used, or imported as specified, or for the manufacture, use, offer for sale, or sale in the United States of which substantial preparation was made before the grant of the reissue, and the court may also provide for the continued practice of any process patented by the reissue that is practiced, or for the practice of which substantial preparation was made, before the grant of the reissue, to the extent and under such terms as the court deems equitable for the protection of investments made or business commenced before the grant of the reissue.

CL90.  Equitable intervening rights provides for the continued manufacture, use, or sale of products if the court deems such continued activity to be equitable.  *See BIC Leisure Prods. V. Windsurfing Int'l., Inc.*, 1 F.3d 1214, 1221 (Fed. Cir. 1993).

CL91.  Autodesk has demonstrated that it has made substantial investments and preparations since 1982 to release new AutoCAD products on a regular basis, and since 2004, on an annual basis, including the employment of more than 40 engineers

working on test development and quality assurance.  Autodesk has demonstrated that AutoCAD has had the functionality to attach raster images since approximately 1997.

CL92.  For the protection of investments made by Autodesk before June 17, 2008 when the '384 reissued patent issued, Autodesk should be allowed to continue manufacturing and selling AutoCAD containing the accused features and should not be liable for damages for the manufacture, use, or sale of AutoCAD for the period from June 17, 2008 until the patent expired on October 4, 2011 even if AISI were to prove infringement of any valid claim of the '384 reissued patent.

## IV.    AISI'S Claim Should Be Barred by Unclean Hands

### 1.    Proposed Findings of Fact

FF228.    Autodesk hereby incorporates each of the proposed findings of fact and conclusions of law identified above.

FF229.    The LunaSeries software required AutoCAD to run.  *See* Trial Tr. 41:19-21, 42:3-6; 42:7-9, Apr. 9, 2013; Trial Ex. 35 at 13.

FF230.    AISI did not have a developer license to develop add-ons to AutoCAD and never made any payments to Autodesk under a developer license.  *See* Trial Tr. 68:15-24, Apr. 9, 2013.

FF231.    The license AISI had to AutoCAD was just the end user license agreement that the user receives when purchasing a copy of AutoCAD.  *See* Trial Tr. 76:2-6, Apr. 9, 2013.

FF232.    Mr. Opincar has not read the end user license agreement.  *See* Trial Tr. 76:10-11, Apr. 9, 2013.

FF233.    AISI was never able to sell or license the patent from the date of issue in October of 1994 until the date of expiration in October of 2011.  *See* Trial Tr. 81:17-82:7, Apr. 9, 2013.

FF234.    AISI cancelled all claims of the '384 reissued patent that do not include a merging limitation, including previously asserted claims 98 and 102 to the extent dependent on claim 98.  AISI continued to assert its on-sale barred claims 98 and 102 until after Autodesk filed a motion for summary judgment of invalidity due to on-sale bar.

FF235.    At the *Markman* hearing in this case, the Court held that claims 98 and 102 were invalid.

## 2.    Proposed Conclusions of Law

CL93.  The unclean hands doctrine closes the door of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief. The trial court has broad discretion under the doctrine of unclean hands.  *See Consol. Al. Corp. v. Foseco Int'l Ltd.*, 910 F.2d 804, 809 (Fed. Cir. 1990).

CL94.  AISI should be precluded from seeking recovery for damages for its patent based on the LunaLink and LunaEdit products when those products were designed, developed, and sold without the requisite developer license from Autodesk. Moreover, AISI should be precluded from enforcing its patent in light of its conduct in obtaining the original '393 patent and the '384 reissued patent, and its spoliation of relevant evidence.

Dated:  April 16, 2013

Respectfully submitted,

*/s/ James Gagen*

E. Leon Carter
Texas State Bar No. 03914300
lcarter@carterstafford.com
J. Robert Arnett II
Texas State Bar No. 01332900
barnett@carterstafford.com
CARTER STAFFORD ARNETT HAMADA
   & MOCKLER, PLLC
8150 N. Central Expressway, Suite 1950
Dallas, TX  75206
Telephone:  (214) 550-8188
Facsimile:  (214) 550-8185

Jeannine Yoo Sano (*pro hac vice*)
jsano@whitecase.com
Eric E. Lancaster (*pro hac vice*)
elancaster@whitecase.com
Jason Xu (*pro hac vice)*
jxu@whitecase.com
James Gagen (*pro hac vice*)
jgagen@whitecase.com
WHITE & CASE LLP
3000 El Camino Real
5 Palo Alto Square, 9th Floor
Palo Alto, CA  94306-1209
Telephone:  (650) 213-0300
Facsimile:  (650) 213-8158

Attorneys for AUTODESK, INC.

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing instrument was duly served on all counsel of record via the Court's ECF/CM System on this 16th day of April, 2013.

*/s/ James Gagen*
James Gagen