# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | |
|---|---|
| AMERICAN IMAGING SERVICES, INC.,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>AUTODESK, INC.,<br><br>　　　　Defendant;<br><br>AUTODESK, INC.,<br><br>　　　　Counterplaintiff,<br><br>　　v.<br><br>AMERICAN IMAGING SERVICES, INC.,<br><br>　　　　Counterdefendant. | Civil Action No. 3:09-CV-733-M |

## NOTICE OF PROPOSED DESIGNATIONS OF TESTIMONY
## OF PAUL V. STORM FROM BENCH TRIAL

Pursuant to the Court's directions at the October 3, 2013 Pretrial Conference, Autodesk hereby provides a highlighted markup of the Trial Transcript from the first phase bench trial in the above-captioned matter of the testimony of Paul V. Storm that Autodesk proposes to proffer in the upcoming jury trial subject to the conditions set by the Court.

Dated: October 7, 2013

Respectfully submitted,

*/s/ James P. Gagen*
E. Leon Carter
Texas State Bar No. 03914300

1

lcarter@carterstafford.com
J. Robert Arnett II
Texas State Bar No. 01332900
barnett@carterstafford.com
CARTER STAFFORD ARNETT HAMADA
 & MOCKLER, PLLC
8150 N. Central Expressway, Suite 1950
Dallas, TX  75206
Telephone:  (214) 550-8188
Facsimile:  (214) 550-8185

Jeannine Yoo Sano (*pro hac vice*)
jsano@whitecase.com
Eric E. Lancaster (*pro hac vice*)
elancaster@whitecase.com
Jason Xu (*pro hac vice)*
jxu@whitecase.com
James P. Gagen (*pro hac vice*)
jgagen@whitecase.com
WHITE & CASE LLP
3000 El Camino Real
5 Palo Alto Square, 9th Floor
Palo Alto, CA  94306-1209
Telephone:  (650) 213-0356
Facsimile:  (650) 213-8158

**Attorneys for AUTODESK, INC.**

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing instrument was duly served on all counsel of record via the Court's ECF/CM System on this 7th day of October, 2013.

 */s/ James P. Gagen*
James Gagen

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

AMERICAN IMAGING SERVICES   )   3:09-CV-00733-M
   Plaintiff-Counterdefendant )
                             )
VERSUS                       )   DALLAS, TEXAS
                             )
AUTODESK                     )
   Defendant-Counterplaintiff )   APRIL 17, 2013

VOLUME 3
TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE BARBARA M.G. LYNN,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:   PAUL V. STORM
                     Gardere Wynne Sewell LLP
                     1601 Elm Stree, Suite 3000
                     Dallas, TX 75201
                     214-999-4701
                     pvstorm@gardere.com

                     JONATHAN T. SUDER
                     Friedman Suder & Cooke PC
                     Tindall Square Warehouse # 1
                     604 E 4th Street, Suite 200
                     Fort Worth, TX 76102
                     817/334-0400
                     jts@fsclaw.com

1

                     SARAH M. PAXSON
                     Gardere Wynne & Sewell LLP
                     1601 Elm Street, Suite 3000
                     Dallas, TX 75201-4761
                     214/999-4890
                     spaxson@gardere.com

FOR THE DEFENDANT:   JEANNINE SANO
                     White & Case LLP
                     5 Palo Alto Square
                     3000 El Camino Real
                     9th Floor
                     Palo Alto, CA 94306
                     650/213-0356
                     jsano@whitecase.com

                     ERIC LANCASTER
                     White & Case LLP
                     3000 El Camino Real
                     Five Palo Alto Square 9th Floor
                     Palo Alto, CA 94306
                     650/213-0300
                     elancaster@whitecase.com

                     E. LEON CARTER
                     Carter Stafford Arnett
                     Hamada & Mockler PLLC
                     8150 N Central Expressway
                     Suite 1950
                     Dallas, TX 75206
                     214/550-8188
                     lcarter@carterstafford.com

COURT REPORTER:      PAMELA J. WILSON, RMR, CRR
                     1100 Commerce Street, Room 1535
                     Dallas, Texas 75242
                     214.662.1557
                     pam_wilson@txnd.uscourts.gov

Proceedings reported by mechanical stenography,
transcript produced by computer.

2

1   BENCH TRIAL - VOLUME 3 - APRIL 17, 2013
2              **P R O C E E D I N G S**
3       THE SECURITY OFFICER:  All rise.
4       Hear ye.  Hear ye.  Hear ye
5       The United States District Court in and for the Northern
6   District of Texas is now in session, the Honorable United
7   States District Judge Barbara M.G. Lynn presiding.
8       Please be seated.
9       THE COURT:  Good afternoon.
10      MR. SUDER:  Good afternoon, Your Honor.
11      MR. CARTER:  Good afternoon.
12      THE COURT:  Let's pick up where we were.
13      MS. SANO:  Your Honor, before we start can we take
14  care of a couple of housekeeping items regarding exhibits?
15      THE COURT:  Okay.
16      MS. SANO:  There were a number of exhibits that we'd
17  like to move into the record at this point.  Those would be
18  Exhibit Numbers 20, 54, 84, 142, 157, and 171.
19      And then with respect to Exhibit 84, there were just
20  portions of it that had been previously admitted, and we just
21  wanted to make sure that the entire exhibit was admitted into
22  the evidence.
23      THE COURT:  Any objection?
24      MR. STORM:  No objection.
25      THE COURT:  All right.  Defense Exhibits -- is that

3

1   how you've marked them?  I don't remember.
2       Have you marked them defendants?
3       MR. CARTER:  I think they're just exhibits, Your
4   Honor.
5       THE COURT:  I'm sorry?
6       MR. CARTER:  There is no plaintiff or defendant.
7       THE COURT:  Okay.  All right.  Those Exhibits 20,
8   54, 84, the entirety, 142, 157, 170 and 171 are admitted.
9       MS. SANO:  And there is also, with respect to
10  Exhibit 35, we noted that the copy that we had filed with the
11  court is speckled and a little difficult to read and we found
12  a cleaner copy that also has an additional set of Bates
13  numbers and we conferred with counsel and they agreed it would
14  be acceptable to swap out Exhibit 35.
15      We don't have a current copy here immediately, but we
16  just wanted to note that for the court.
17      THE COURT:  Okay.  No problem.
18      Am I not getting a copy up here?
19      You can proceed, Mr. Carter.
20      MR. CARTER:  Thank you, Your Honor.
21      Autodesk would call David McCombs.  And he's present with
22  counsel, Mr. Russ Emerson.
23      MR. EMERSON:  Your Honor, Russ Emerson for
24  Mr. McCombs.
25      THE COURT:  Yes.

4

```
 1  fact; is that correct?
 2  A.  That's my understanding.
 3  Q.  And it looks like here, "On August 3rd, 1989, Mr. Opincar
 4  sent Mr. Spevak y'all's allegation, a letter, and then he
 5  followed up with a demonstration disc."
 6        Did I read that correctly?
 7  A.  That's what it says.
 8  Q.  And so they're two separate documents.  There's a letter
 9  and then a follow-up of a disc.  Is that correct?
10        MR. SUDER:  Objection, Your Honor, on relevance.
11  These are proposed findings of fact.  The document is in
12  evidence and speaks for itself, and the court will decide what
13  the letter says.
14        MR. STORM:  And --
15        THE COURT:  If that's an objection, it's overruled.
16        MR. CARTER:  Thank you.
17        Yes.  Hold on.  Hold on.
18        THE WITNESS:  I need the question asked again or --
19        MR. CARTER:  I'll ask it.
20        THE WITNESS:  Thanks.
21  BY MR. CARTER:
22  Q.  And in the proposed findings of fact number 22 you-all
23  are representing to the court that Mr. Opincar sent a letter
24  to Autodesk, and in a separate document he sent a
25  demonstration disc.  Is that correct?
                                                              65
```

```
 1  A.  I don't read it as a separate document.  It says,
 2  "Followed up," so that would mean a later transmission.
 3        I would note this may have been address by Mr. Opincar,
 4  and I wasn't here for that testimony, but I can read the words
 5  as well as you can.
 6  Q.  So my question is, doesn't it appear that a letter was
 7  sent to Mr. Spevak at Autodesk, and then subsequent to the
 8  letter a follow-up letter or document was sent which contained
 9  a demonstration disc?
10  A.  I don't -- I don't read it as having a letter, but it
11  might have with the second transmission.
12  Q.  It happened at two different dates?
13  A.  It does appear to be two different dates.
14  Q.  Okay.  And you were not here when Mr. Opincar testified
15  in response to one of Judge Lynn's questions that he sent the
16  disc in the same letter dated August 3rd, 1989.
17        You weren't here for that, were you?
18  A.  I was not here for that.
19  Q.  Now, you would agree, Mr. Storm, that the original
20  complaint in AISI versus Intergraph was filed on or about
21  April 24th, 1997?
22  A.  That sounds right.
23  Q.  And then summary judgment in that case was granted in or
24  about March of 1999.
25  A.  That also sounds correct.
                                                              66
```

```
 1  Q.  And I think you just indicated that you did not play any
 2  role in the prosecution of the underlying '393 patent; is that
 3  right?
 4  A.  That is correct.
 5  Q.  Okay.  And -- which means you didn't sign any amendments,
 6  any responses to office actions, or any IDSes during the
 7  prosecution of the '393?
 8  A.  That's correct.
 9  Q.  So your personal knowledge of the actual prosecution
10  started with the reissue prosecution?
11  A.  No.  It started with working on the appellate oral
12  argument.
13  Q.  Okay.  Now, I think you-all have in evidence Exhibit 501,
14  and that is the file history.
15        Do you have that up there?
16        I don't think --
17  A.  It's not on the screen yet.
18  Q.  Okay.
19  A.  And it's like 3800 pages, so I doubt that I have the
20  whole thing here.
21  Q.  But that is in evidence, isn't it?
22  A.  Yes, it is.
23  Q.  Okay.  And, again, that's the file history that was
24  provided to the examiner during the prosecution.  Is that
25  correct?
                                                              67
```

```
 1  A.  Of the reissue.
 2  Q.  Of the -- of the '384 patent?
 3  A.  That's the '384.
 4  Q.  Yes.  So if AIS had provided a document to the examiner
 5  during prosecution of the '384 patent, it would be within that
 6  voluminous Exhibit 501.  Is that a correct statement?
 7  A.  Probably.  There's some chance -- we got that from the
 8  patent office, there might be a document missing, but I would
 9  suspect they're all there.
10  Q.  Okay.  There's some chance that what happened?
11  A.  The patent office lost something we gave them.
12  Q.  Okay.  Okay.  And if the examiner provided or produced a
13  document during the prosecution of the '384 patent, if the
14  examiner found a document or produced a document, that should
15  also be included in Exhibit 501, the file history, shouldn't
16  it?
17  A.  I would expect to find it there, yes.
18  Q.  Okay.  So 501 is the official file with all the
19  references in it.
20  A.  Yes.  Yes, it is.
21  Q.  Okay.  And then I think we introduced into evidence 433.
22        Do you recall that?
23  A.  Yes, I do.
24  Q.  And that does not contain the -- all the documents, does
25  it?
                                                              68
```

1  "An in-person interview was held with examiner Phu
2  Nguyen, on February 9, 2006 to discuss the previously
3  submitted preliminary amendments in view of CAD Overlay,
4  SuperPaint and applicants' potential on-sale issues.  We had
5  submitted preliminary amendments."
6      And we talked about them at the interview, and this is a
7  summary of that discussion.
8          MR. CARTER:  Your Honor, I object, nonresponsive.
9  My question was a yes or no answer.
10         THE COURT:  I don't think it was.  Rephrase your
11 question.
12         MR. CARTER:  If you don't think it was, it wasn't.
13 BY MR. CARTER:
14 Q.  You told the examiner when you wrote this statement to
15 him, "Applicant showed that SuperPaint was unable to maintain
16 registration between a raster image and vector-based image."
17     Did I read that correctly?
18 A.  You read that correctly.
19 Q.  And it is a false statement as you just testified two
20 minutes ago that SuperPaint is unable to maintain registration
21 between the raster image and vector-based image?
22 A.  It is not a false statement in the context of this
23 document, which is summarizing an interview which covered a
24 lot of material.
25 Q.  Okay.  Let's go at this a different way.

                                                           105

1  ==Can SuperPaint 1.0 maintain registration between the==
2  ==raster image and vector-based image?==
3  ==A.  Yes.==
4  Q.  You told the examiner during this demonstration that
5  SuperPaint was unable to maintain registration between the
6  raster image and vector-based image.  Is that correct?
7      That's what you told them?
8  A.  That is not correct.
9  Q.  Am I reading something wrong?
10 A.  You are reading a part of one sentence of a 40-page
11 document summarizing an interview.  The entirety of the
12 interview and the document are completely accurate.  And if
13 you take one phrase out of it and say it's not true, then
14 you're not staying in context.
15 Q.  Well, let's read that whole -- okay, Mr. Storm.  I got
16 you.
17     Let's read that whole sentence.  "Specific --"
18     Specifically, I mean you and Mr. Opincar and the two
19 attorneys from your office had a specific purpose or specific
20 intent in going to D.C. to meet with the examiner, am I right?
21 A.  We did.
22 Q.  You wanted to show the examiner what SuperPaint's
23 functionality was and capabilities were, didn't you?
24 A.  I wanted to show them that the claim amendments which we
25 had submitted were patentable over SuperPaint.

                                                           106

1  Q.  You wanted to show them what?
2  A.  That the claim amendments we had submitted were
3  patentable over SuperPaint.
4  Q.  Okay.  And one of the amendments that you submitted tried
5  to make a distinction between SuperPaint and LunaLink as far
6  as maintaining registration; is that right?
7  A.  Using the vector origin and vector coordinates.  That's
8  what the amendment says.
9  Q.  Yes.  Yes.  Now, let me ask you this question before I
10 ask you something else.
11     Are vector coordinates and predetermined origin, are
12 those the same thing?
13 A.  Well, coordinates and origin are not the same thing to
14 begin with, so no.
15 Q.  They're not.
16     Okay.  We'll talk about that a little bit more.
17     You state specifically, and I'll read the whole
18 paragraph, the whole sentence to you.
19     "Specifically, applicants showed that SuperPaint was
20 unable to maintain registration between the raster image and
21 the vector-based image, whereas the present invention does
22 maintain registration between the raster image and the
23 vector-based image."
24     Did I read that correctly?
25 A.  You read that sentence correctly.

                                                           107

1  Q.  And it is your sworn testimony here today --
2          THE COURT:  Excuse me.
3          MR. SUDER:  Excuse me, Your Honor.  Under the rule
4  of optional completeness I ask that I be allowed -- or Mr.
5  Carter reference the third page of this document, which is
6  attached as Exhibit A when examining this witness.
7          THE COURT:  Overruled.  I don't apply the rule of
8  optional completeness in a bench trial where I have the
9  document, and I can read the whole thing, so denied.
10         MR. CARTER:  And I have no idea where I was.
11     Let me think, Your Honor.
12         THE COURT:  Well, you have two court reporters here.
13         MR. CARTER:  Can you read that question
14         (Whereupon the question was read back.)
15 BY MR. CARTER:
16 Q.  Okay.  Was one of the purposes in going to Washington to
17 interview, have the in-person interview with the examiner was
18 to establish that SuperPaint was unable to maintain
19 registration?
20 A.  No.
21 Q.  So when you and Mr. Opincar and everyone else got on the
22 plane to go to D.C. to meet with the examiner, you knew that
23 SuperPaint could maintain registration?
24 A.  If you leave out vectors, that's correct.  I've said that
25 already.

                                                           108

```
 1  distinction over SuperPaint.
 2  Q.   What's the other distinction?
 3  A.   The use of real world units.
 4  Q.   Okay.  Anything else?
 5  A.   Those are the two I focused on.
 6  Q.   Okay.
 7  A.   I can't swear there's nothing else in the hundred
 8  something claims that we have.
 9  Q.   Okay.  Okay.  So you would agree that if SuperPaint
10  maintained registration using vector-based coordinates that
11  you wouldn't have been able to get claims 1 and 14 over
12  SuperPaint?
13  A.   I believe claim 14, which is what we focused on and is
14  asserted here, requires a vector origin and vector
15  coordinates.  So I think both of those things would have to be
16  present.
17  Q.   So am I -- am I correct in my assumption?
18  A.   I -- I would summarize it as if the additional terms that
19  were added to claim 14 are found to be present in SuperPaint,
20  then claim 14 should not have issued.
21  Q.   Claims 1 and 14?
22  A.   I haven't looked at 1 in a while, but I'm guessing it's
23  the same.
24  Q.   Okay.  So you would agree with my statement?
25  A.   That seems fair, focusing on the actual claim language
                                                              113
```

```
 1  that's in the claims 1 and 14.
 2  Q.   Okay.  I think the record is a little muddled and that's
 3  because of me.
 4       You would agree that if SuperPaint maintained
 5  registration with respect to the vector-based coordinates,
 6  that American Imaging would not have been able to receive a
 7  patent regarding -- would not have had claims 1 and 14 to be
 8  declared valid over SuperPaint?
 9  A.   I believe that claims 1 and 14 require both a vector
10  origin, and the use of vector coordinates to maintain the two
11  types of images in registration.
12  Q.   If it didn't have one of those two, you wouldn't have
13  gotten those claims over SuperPaint?
14  A.   No, that's not right.  SuperPaint would have to have both
15  of those aspects.
16  Q.   Say that again.
17  A.   SuperPaint would have to show both of those aspects.
18  Q.   Okay.  Looking at Exhibit 433 again, page 376 -- and if
19  you look at page --
20            MR. CARTER:  Let's go to page 379 first.
21       Page 379.
22  BY MR. CARTER:
23  Q.   Do you know what this document is, Mr. Storm?
24  A.   I believe this is the preliminary amendment in the
25  reissue.
                                                              114
```

```
 1  Q.   Okay.  And this is dated -- 379 is dated January 30,
 2  2004, and it's from Storm and Hemingway and a Robin Barnes and
 3  a Greg Tompkins.
 4       Were those two attorneys in your office?
 5  A.   It was George Tompkins, but, yes, those were associates
 6  in my office.
 7  Q.   And if we go back and look at 376, the first full
 8  paragraph, last sentence in the first full paragraph, it
 9  states, "As of the critical date, SuperPaint did not have the
10  ability to allow changes to the view of a vector image while
11  maintaining registration with a raster image."
12  A.   You read that correctly.
13  Q.   Okay.  Was that a true statement or false statement?
14  A.   In the context of this document it's true, because there
15  are claim amendments that distinguish SuperPaint, and this is
16  one sentence in a long document.
17  Q.   So do you -- do you -- in looking at your -- your
18  documents, we have to take all the sentences together to
19  determine whether or not they're truthful?
20  A.   You have to always consider the context of a
21  communication.
22  Q.   Okay.  So this independent statement, it might not be
23  true in and of itself, this one sentence, but if you look at
24  all the paragraphs and sentences surrounding it, it could be
25  true?
                                                              115
```

```
 1  A.   I think the communication is accurate, overall.
 2  Q.   Okay.  And what was the critical date?  Was that June
 3  14th, 1989?
 4  A.   The critical date, I believe, is June 14th, 1988.
 5  Q.   1988.  Okay.  One year before --
 6  A.   Right.
 7  Q.   -- the patent application?
 8  A.   Right.
 9  Q.   Okay.  Were you present, I don't think you were, when
10  Mr. Snider testified?
11  A.   I cross-examined him, so I think I was here.
12  Q.   Okay.  It was last week.  I'm getting old, I can't
13  remember that.
14       Do you recall Mr. Snider testifying that SuperPaint had
15  the ability to allow changes -- or -- with the vector-based --
16  using a vector-based coordinate?
17  A.   I believe so.
18  Q.   Okay.  Nevertheless, that's not something you-all told
19  the patent examiner in an in-person interview in February of
20  1996?
21  A.   I believe we fairly communicated the capability of
22  SuperPaint in that interview.
23  Q.   Let me ask you this about that demonstration.
24       Whose idea was it to do a demonstration?
25  A.   I believe it was mine.
                                                              116
```

```
 1  states that, "The applicants' representatives conducted a
 2  telephone interview with examiner Nguyen on February 5th,
 3  2007"?
 4  A.  Yes.
 5  Q.  So the document that is signed and dated February 12th,
 6  2006, should be 2007, shouldn't it?
 7  A.  Yes.
 8  Q.  Now, you would agree, since it's signed and should be
 9  February 12th, 2007, that the reissue prosecution for the
10  reissue patent was filed more than three years after the
11  reissue answer of the '393 patent?
12  A.  Yes, definitely more than three years after the issuance
13  of the '393.
14  Q.  And because of that, by law the only thing that you can
15  do in a reissue patent is narrow the claims?
16  A.  Narrow the claims compared to the original issued claims,
17  yes.
18  Q.  Okay.  It can't -- it can't contain any new matter in
19  that circumstance?
20  A.  That's not the same issue usually.
21      The claims in a reissue that are more than two or three
22  years after the original issue date, which would definitely
23  apply here, the claims cannot be broader than the broadest
24  original claim.
25  Q.  Okay.  But are you saying they can contain new matter?
                                                            145
```

```
 1  A.  No.
 2  Q.  They cannot?
 3  A.  That's -- that's not a specification -- that's not a
 4  claim question.  It's a different part of the prosecution
 5  question.
 6  Q.  So it can or cannot contain new matter?
 7  A.  You cannot introduce new matter in a reissue.
 8  Q.  Thank you.
 9      That's more than three years.
10  A.  You cannot introduce new matter in a reissue, period.
11  Q.  Period.  Thank you.
12      You can tell I'm not a patent attorney.
13      Okay.  So let's look at page 63 of Exhibit 433.
14           MR. CARTER:  Number 16, Derrick.
15      I apologize for not telling you the page number each
16  time.
17  BY MR. CARTER:
18  Q.  It says, "Please amend the specification."
19      And then it states, "In one aspect of the invention the
20  scanned document is represented by a first digital coded image
21  which includes a first plurality of image elements, each of
22  which has a defined position relative to a predetermined
23  reference position or predetermined origin."
24      What does the underlying portion represent there?
25  A.  The underlying portion represents words that are added to
                                                            146
```

```
 1  the specification by this proposed amendment.
 2  Q.  Okay.  Words that are added, but no new matter is added?
 3  A.  Correct.
 4  Q.  So predetermined reference position or predetermined
 5  origin mean the same thing?
 6  A.  Right.
 7  Q.  And if you look at the -- the next, it states, "Please
 8  amend the specification."
 9      In the highlighted portion it states, "The user inputs
10  corresponding to the desired drawings features are stored in a
11  vector database, 18, where the design feature -- features are
12  represented by a plurality -- plurality of discrete vectors,
13  selected ones of which have starting and ending point
14  coordinates with a reference to a predetermined origin or a
15  vector origin."
16      Did I read that correctly?
17  A.  Yes.
18  Q.  So predetermined origin or vector origin means the same
19  thing?
20  A.  Yes.
21  Q.  Predetermined origin or vector origin are all the same?
22  A.  In this patent?
23  Q.  Is that correct?
24  A.  Yes.
25  Q.  In fact, if you look at page 91 of Defendant's Exhibit
                                                            147
```

```
 1  433 --
 2           MR. CARTER:  Which is number 17, Derrick.
 3  BY MR. CARTER:
 4  Q.  -- this is talking about the interview summary conducted
 5  with the examiner on February 5th, 2007.  Is that correct?
 6  A.  Yes.
 7  Q.  And then it states, "Applicant" -- why don't you read in
 8  the highlighted portion there where it says "applicant
 9  proposes."
10  A.  Okay.  Thank you for making it bigger.  I appreciate
11  that.
12  Q.  He's going to try.
13  A.  Can you do it again?
14  Q.  He's going to do it.
15      Do you have 433 up there?
16  A.  I don't know.
17  Q.  Okay.  That's okay.  There it is.  There it is.
18  A.  I'll read it here.  And then if I need to get this, I
19  will.
20  Q.  Go ahead.
21  A.  The highlighted portion says, "Applicant proposes the
22  amended claim 85 to include the editing of the raster and
23  vector images using a common predetermined vector origin.  The
24  examiner agrees that the proposed amendment would overcome the
25  rejection."
                                                            148
```

```
 1  Q.  Okay.  And then in specification it states, "Applicants
 2  have amended the specification to include the terms vector
 3  origin and predetermined origin as alternative terms so as to
 4  provide a direct antecedent basis in the specification for
 5  terms contained in the claims and for purposes of clarity.  No
 6  new matter has been added."
 7  A.  Yes.
 8  Q.  Is that -- was that correct?
 9  A.  You read it correctly.
10  Q.  And was that correct as far as the patent is concerned,
11  that -- that term?
12  A.  I believe so.
13  Q.  Okay.  And you said you did the oral argument in the
14  appeal in the Intergraph matter?
15  A.  I did.
16  Q.  Okay.  And you're familiar with the opinion?
17  A.  I am.
18  Q.  Very familiar?
19  A.  Yes, I am.
20  Q.  Wouldn't be sitting here if you weren't familiar with it,
21  would you?
22  A.  That's pretty fair.
23  Q.  Okay.  Now, you would agree that the Fed circuit found
24  claims 1 through 7 and 14 through 29 of the '393 patent
25  anticipated by SuperPaint as matter of law?
                                                          149
```

```
 1  A.  I don't remember exactly the claim numbers, but I'm sure
 2  you've got it right.
 3  Q.  Okay.
 4  A.  I have no reason to doubt that.
 5  Q.  Okay.  So that means that the federal circuit found that
 6  each and every limitation for those claims, 1 through 17, 14
 7  through 29, were present within SuperPaint.  Is that a correct
 8  statement?
 9  A.  Yes.
10  Q.  And you're aware that the Fed circuit also found that
11  claims 8 through 11, 13, 30 through 34, and 37 through 41 were
12  obvious as a matter of law in light of SuperPaint?
13  A.  That sounds right.  Again, claim numbers, I couldn't
14  recite, but I'm sure you got the numbers right.
15  Q.  Okay.  So the remaining claims, there were only four
16  remaining claims?
17  A.  Yes.
18  Q.  12, 35, 36 and 42.
19  A.  That's right.
20  Q.  And those four claims were dependent claims relative to
21  the interrupt vector tables, which are not at issue here?
22  A.  That's correct.
23  Q.  You would agree that the Fed circuit found that because
24  claims 8 through 11, 30 through 34 and claims 37 were limited
25  to CAD systems, they weren't anticipated, but were obvious as
                                                          150
```

```
 1  a matter of law in light of SuperPaint?
 2  A.  That's what they held.
 3  Q.  So you would agree that the Fed circuit found that
 4  SuperPaint 1.0 disclosed a method of manipulating a scanned
 5  document?
 6  A.  They didn't talk about it, but they implicitly did.
 7  Q.  So that is correct?
 8  A.  Yes.
 9  Q.  And let's look at Exhibit 75, which is the '393 patent.
10      Claim 14, column 11.
11      Would you agree that the Fed circuit held that SuperPaint
12  disclosed each one of those under claim 14, each one of those
13  elements under claim 14?
14  A.  Yes, I believe they did.
15  Q.  Pardon me?
16  A.  Yes.
17  Q.  Which is claim 14 of the '393 patent, which is
18  Defendant's Exhibit 75; is that right?
19  A.  Yes.
20  Q.  Okay.  So you would agree that SuperPaint 1.0 discloses
21  raster images?
22  A.  It does.
23  Q.  You would agree with me that SuperPaint 1.0 discloses
24  vector-based images?
25  A.  It does.
                                                          151
```

```
 1  Q.  Would you agree with me that claim 14 of the '393 patent,
 2  which the Fed Circuit found anticipated by SuperPaint contains
 3  the term "vector-based images"?
 4      Do you see that?
 5  A.  The federal circuit found that?
 6  Q.  In the third paragraph it says in claim 14 of the '393,
 7  "Electronically display in response to user input commands,
 8  simultaneously with the display of said raster first image, a
 9  second image, and said second image being a vector-based
10  image."
11      Did I read that correctly?
12  A.  You did.
13  Q.  And then if you go to claim 25, which is in column 13,
14  which is talking about an apparatus, SuperPaint stated that
15  that was disclosed as well, didn't they?
16  A.  Again, I believe that's what they said.  I'd have to
17  check the anticipation versus obviousness numbers.
18  Q.  But either under anticipation or obviousness they said
19  that SuperPaint disclosed it?
20  A.  It would not necessarily be disclosed if it was not
21  anticipated.
22  Q.  And going back to claim 14, claim 14 has a predetermined
23  position.
24      Would you agree?
25  A.  Yes.  You have to look at the whole claim in context, but
                                                          152
```

```
 1  it says in the middle there about line 40 predetermined
 2  position.
 3  Q.   So SuperPaint disclosed a predetermined reference
 4  position; isn't that correct?
 5  A.   You have to look at the whole claim element, but it
 6  disclosed what the claim is.
 7  Q.   SuperPaint disclosed a predetermined reference position.
 8  The Fed circuit found that.
 9  A.   That's -- that's -- I believe the answer is yes, but it's
10  not in claim 14.
11  Q.   Okay.  Where is it?
12  A.   I think it was in the other claim you were looking at.
13  Q.   Okay.  Let's go back to 14.
14       It states electronically -- there it is right there.
15       Let's go back to claim 25.
16       It says, "Apparatus according to claim 23 wherein said
17  second means operates to generate said vector-based image to
18  include a plurality of vectors representing a predetermined
19  shape at a particular position with respect to the
20  predetermined referenced position."
21       Did I read that correctly?
22  A.   Yes, you did.
23  Q.   And SuperPaint disclosed a predetermined reference
24  position.
25  A.   The federal circuit found that this element was present.
                                                           153
 1  Q.   In SuperPaint?
 2  A.   Yes.
 3  Q.   Okay.  And you testified that predetermined reference
 4  position, predetermined position, and vector-based images are
 5  the same -- vector-based origin are the same?
 6  A.   It was the words that are in the patent.  I think it's
 7  predetermined origin, we looked at it, and vector origin.
 8  Q.   All mean the same thing?
 9  A.   Yes.
10  Q.   And the Fed circuit found that SuperPaint disclosed all
11  of those?
12  A.   They did.
13  Q.   So you agree that SuperPaint has a vector origin?
14  A.   I believe the federal circuit found that.
15  Q.   You don't agree with the opinion, but you agree that the
16  Fed circuit found that SuperPaint had a vector origin?
17  A.   Yes.
18  Q.   And so the -- getting back to the statement that you have
19  in your summary of the interview with the patent examiner,
20  where you indicate specifically SuperPaint was unable to
21  maintain registration between the raster image and the vector
22  image, how did you come up with that?
23  A.   It was a summary of the interview where we talked about
24  the vector origin and the use of vector coordinates to
25  maintain the images in registration.
                                                           154
 1  Q.   Let me ask you this question then.
 2       You would agree that the statement written as I read and
 3  just quoted is an incorrect statement?
 4  A.   It's not the best summary I ever wrote.
 5  Q.   Okay.  It's wrong.
 6  A.   I believe in the context of the interview and the whole
 7  document it's not wrong.
 8  Q.   Okay.
 9  A.   Taken out of context, it's not correct.
10  Q.   Okay.  It's false as written?
11  A.   I don't believe it's false as written for the reasons
12  I've said.
13  Q.   It's misleading as written?
14  A.   No, I don't believe so.
15       MR. SUDER:  That's the fourth time he's answered
16  that question.
17       THE COURT:  I think Mr. Storm is doing fine, and he
18  doesn't need to have any assistance from the objections.
19       THE WITNESS:  Yes.
20       THE COURT:  Overruled.
21  BY MR. CARTER:
22  Q.   How many times did you say you watched -- personally
23  watched the SuperPaint video?
24  A.   During the reissue and before, once.
25  Q.   I don't know what that means.
                                                           155
 1  A.   Since this lawsuit was filed I may have watched it more,
 2  and I'm not talking about that.
 3  Q.   Okay.  I think he can protect himself.
 4       THE COURT:  I couldn't hear the rest.
 5       MR. CARTER:  He said since the lawsuit has been
 6  filed I've watched it, and I can't talk about that, or I'm not
 7  talking about that.
 8  BY MR. CARTER:
 9  Q.   Did I --
10  A.   Something to that effect.
11       What I understand to be the relevant time frame I've
12  watched it.
13  Q.   So do you have a copy of that SuperPaint video, or does
14  your client have a copy?
15  A.   I believe I have a copy now.
16  Q.   So you made a copy?
17  A.   At some point during this lawsuit.
18  Q.   Okay.  Do you know if Mr. Opincar still has his copy?
19  A.   I don't know.  I'm sure he has it, or we have it in our
20  records for this case.
21  Q.   Do you recall when you were questioning Mr. Snider the
22  other day about SuperPaint and you asked him -- or he was
23  asked what happened to the raster image and the vector objects
24  when panned, do you recall him saying they stayed in
25  registration?
                                                           156
```